HEFFRON, SECRETARY AND MANAGER OF THE MINNESOTA STATE AGRICULTURAL SOCIETY BOARD OF MANAGERS, ET AL. v. INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., ET AL.

No. 80–795.   Argued April 20, 1981—Decided June 22, 1981

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL and STEVENS, JJ., joined, *post,* p. 656. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, *post,* p. 663.

*Kent G. Harbison,* Special Assistant Attorney General of Minnesota, argued the cause for petitioners. With him on the briefs were *Warren Spannaus,* Attorney General, and *William P. Marshall,* Special Assistant Attorney General.

*Laurence H. Tribe* argued the cause for respondents. With him on the brief were *Barry A. Fisher* and *David Grosz.**

JUSTICE WHITE delivered the opinion of the Court.

The question presented for review is whether a State, consistent with the First and Fourteenth Amendments, may require a religious organization desiring to distribute and sell religious literature and to solicit donations at a state fair to conduct those activities only at an assigned location within the fairgrounds even though application of the rule limits the religious practices of the organization.

---

*Briefs of *amici curiae* urging reversal were filed by *Robert Abrams,* Attorney General, *Shirley Adelson Siegel,* Solicitor General, and *Thomas J. Maroney* and *George M. Levy,* Assistant Attorneys General, for the State of New York; by *William J. Brown,* Attorney General, and *Gary Elson Brown,* Special Assistant Attorney General, for the State of Ohio; and by *John H. Larson* and *DeWitt W. Clinton* for the County of Los Angeles.

Briefs of *amici curiae* urging affirmance were filed by *J. Albert Woll, Marsha Berzon,* and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations; and by *Bruce J. Ennis, Jr.,* and *Charles S. Sims* for the American Civil Liberties Union et al.

Briefs of *amici curiae* were filed by *John Jordan* for the Gujarat Cultural Association, Inc., et al.; and by *Fletcher N. Baldwin, Jr.,* for the India Cultural Society of New Jersey et al.

## I

Each year, the Minnesota Agricultural Society (Society), a public corporation organized under the laws of Minnesota, see Minn. Stat. § 37.01 (1980), operates a State Fair on a 125-acre state-owned tract located in St. Paul, Minn.[1] The Fair is conducted for the purpose of "exhibiting . . . the agricultural, stock-breeding, horticultural, mining, mechanical, industrial, and other products and resources of the state, including proper exhibits and expositions of the arts, human skills, and sciences." *Ibid.* The Fair is a major public event and attracts visitors from all over Minnesota as well as from other parts of the country. During the past five years, the average total attendance for the 12-day Fair has been 1,320,000 persons. The average daily attendance on weekdays has been 115,000 persons and on Saturdays and Sundays 160,000.

The Society is authorized to make all "bylaws, ordinances, and rules, not inconsistent with law, which it may deem necessary or proper for the government of the fair grounds . . . ." Minn Stat. § 37.16 (1980). Under this authority, the Society promulgated Minnesota State Fair Rule 6.05 which provides in relevant part that

> "[s]ale or distribution of any merchandise, including printed or written material except under license issued [by] the Society and/or from a duly-licensed location shall be a misdemeanor."

As Rule 6.05 is construed and applied by the Society, "all persons, groups or firms which desire to sell, exhibit or distribute materials during the annual State Fair must do so only from fixed locations on the fairgrounds."[2] Although the Rule does not prevent organizational representatives from walking about the fairgrounds and communicating the orga-

---

[1] The facts are taken primarily from the parties' stipulation of facts filed with the Minnesota District Court on July 31, 1978, and reprinted in the joint appendix. App. A–30 through A–36.

[2] Stipulation of Fact #16.

nization's views with fair patrons in face-to-face discussions,[3] it does require that any exhibitor conduct its sales, distribution, and fund solicitation operations from a booth rented from the Society. Space in the fairgrounds is rented to all comers in a nondiscriminatory fashion on a first-come, first-served basis with the rental charge based on the size and location of the booth.[4] The Rule applies alike to nonprofit, charitable, and commercial enterprises.[5]

One day prior to the opening of the 1977 Minnesota State Fair, respondents International Society for Krishna Consciousness, Inc. (ISKCON), an international religious society espousing the views of the Krishna religion, and Joseph Beca, head of the Minneapolis ISKCON temple, filed suit against numerous state officials seeking a declaration that Rule 6.05, both on its face and as applied, violated respondents' rights under the First Amendment, and seeking injunctive relief

---

[3] Fair officials did not "intend to restrict [respondents] from peaceably walking about the fairgrounds and discussing their political, religious or other views with Fair patrons." Affidavit of Michael Heffron, App. A–28. See also Tr. of Oral Arg. 5–7. The trial court expressly permitted such oral proselytizing, see *infra*, at 646, and that part of the order was not challenged or appealed.

[4] Over 1,400 exhibitors and concessionaires rented booth space during the 1977 and 1978 Fairs, with several hundred potential exhibitors denied rental space solely because of the limited amount of area available. The propriety of the fee is not an issue in the present case. Cf. *Cox* v. *New Hampshire*, 312 U. S. 569, 576–577 (1941).

[5] The following represent some of the charitable, religious, and other non-commercial organizations that rented booth space at the 1978 Minnesota State Fair: Abortion Rights Council of Minnesota, American Association of Retired Persons, American Heart Association, American Party of Minnesota, Christian Business Men's Association, Church of Christ, D. F. L. State Central Committee, Faith Broadcasting Network, Inc., Independent Republicans of Minnesota, Minnesota Foster Parents Association, Twin Cities Baptist Messianic Witness, World Home Bible League, Christian Educational Service, Lutheran Colportage Service, Minnesota Citizens Concerned for Life, Save Our Unwanted Life, Inc., and United States-China Peoples Friendship Association.

prohibiting enforcement of the Rule against ISKCON and its members. Specifically, ISKCON asserted that the Rule would suppress the practice of Sankirtan, one of its religious rituals, which enjoins its members to go into public places to distribute or sell religious literature and to solicit donations for the support of the Krishna religion.[6] The trial court entered temporary orders to govern the conduct of the parties during the 1977 Fair.[7] When that event concluded and after a hearing, the trial court granted the state officials' motion for summary judgment, upholding the constitutionality of Rule 6.05. Relying on the reasoning in *International Society for Krishna Consciousness, Inc.* v. *Evans*, 440 F. Supp. 414 (SD Ohio 1977), the court found that the State's interest "in providing all fair goers and concessionaries with adequate and equal access to each other and in providing a minimum of

---

[6] In performing Sankirtan, ISKCON members "often greet members of the public by giving them flowers or small American flags . . . ." Stipulation of Fact #11. For the purpose of this lawsuit, respondents did not assert any right to seek contributions in return for these "greeting gifts," nor did they seek to dance, chant, or engage in any other activities besides the distribution and sale of literature and the solicitation of donations. *Ibid.*

[7] The trial court temporarily restrained the officials from "arresting, participating in the arrest of, excluding from the Fairgrounds, or preventing activities of [respondents], such as, espousing their religious beliefs, proselytizing others to those beliefs, distributing religious literature or soliciting donations for religious purposes in any portion of the Minnesota Fair Grounds generally open to the public during the 1977 Minnesota State Fair." The court enjoined respondents from "selling or inducing others to purchase, religious literature, items or artifacts, except at a space rented for that purpose on the grounds of the Minnesota Agricultural Society in compliance with the applicable regulations of said Society." Respondents took part in the 1977 Fair pursuant to the terms of the court order. The State submitted various affidavits stating that respondents violated the terms of the order by misrepresenting their cause in seeking solicitations, and by making similar fraudulent statements. These charges are disputed by respondents.

congestion on the fairgrounds" was sufficient to sustain Rule 6.05's limitations as applied to respondents.[8] The court, however, provided that respondents were free to "[r]oam throughout those areas of the fairgrounds generally open to the public for the purpose of discussing with others their religious beliefs."

On appeal, the Minnesota Supreme Court reversed, holding that Rule 6.05, as applied to respondents, unconstitutionally restricted the Krishnas' religious practice of Sankirtan. 299 N. W. 2d 79 (1980). The court rejected the Society's proffered justifications for the Rule as inadequate to warrant the restriction. Furthermore, the application of Rule 6.05 to ISKCON was not essential to the furtherance of the State's interests in that those interests could be served by means less restrictive of respondents' First Amendment rights. We granted the state officials' petition for writ of certiorari in light of the important constitutional issues presented and the conflicting results reached in similar cases in various lower courts.[9] 449 U. S. 1109.

---

[8] Given the great number of exhibitors at the State Fair, the trial court was of the view that "[s]ome form of time, place and manner restriction is clearly required if the free speech rights of each of these exhibitors are to be protected." Accordingly, the court ordered that respondents be prohibited from distributing materials such as books, flowers, flags, incense, or artifacts and from engaging in sales or solicitation for monetary donations throughout the fairgrounds except from a booth rented from the Society.

[9] Compare *International Society for Krishna Consciousness, Inc.* v. *Barber,* 506 F. Supp. 147 (NDNY 1980), rev'd, 650 F. 2d 430 (CA2 1981) (invalidating "booth" rule); *Edwards* v. *Maryland State Fair and Agricultural Society, Inc.,* 628 F. 2d 282 (CA4 1980) (same); *International Society for Krishna Consciousness, Inc.* v. *Bowen,* 600 F. 2d 667 (CA7) (same), cert. denied, 444 U. S. 963 (1979); *International Society for Krishna Consciousness, Inc.* v. *Colorado State Fair and Industrial Exposition Comm'n,* 199 Colo. 265, 610 P. 2d 486 (1980) (same), with *Hynes* v. *Metropolitan Government of Nashville,* 478 F. Supp. 9 (MD Tenn. 1979) (upholding "booth" rule); *International Society for Krishna Consciousness, Inc.* v. *Evans,* 440 F. Supp. 414 (SD Ohio 1977) (same). Related issues have been raised concerning religious groups' access to other types of public

## II

The State does not dispute that the oral and written dissemination of the Krishnas' religious views and doctrines is protected by the First Amendment. See *Schneider* v. *State,* 308 U. S. 147, 160, 162–164 (1939); *Lovell* v. *City of Griffin,* 303 U. S. 444, 452 (1938). Nor does it claim that this protection is lost because the written materials sought to be distributed are sold rather than given away or because contributions or gifts are solicited in the course of propagating the faith. Our cases indicate as much. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 111 (1943); *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 632 (1980). See *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940).

It is also common ground, however, that the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired. *Adderley* v. *Florida,* 385 U. S. 39, 47–48 (1966); *Poulos* v. *New Hampshire,* 345 U. S. 395, 405 (1953); see *Cox* v. *Louisiana,* 379 U. S. 536, 554 (1965). As the Minnesota Supreme Court recognized, the activities of ISKCON, like those of others protected by the First Amendment, are subject to reasonable time, place, and manner restrictions. *Grayned* v. *City of Rockford,* 408 U. S. 104 (1972); *Adderley* v. *Florida, supra; Kovacs* v. *Cooper,* 336 U. S. 77 (1949); *Cox* v. *New Hampshire,* 312 U. S. 569 (1941).[10] "We have often ap-

---

facilities. See *International Society for Krishna Consciousness of Atlanta* v. *Eaves,* 601 F. 2d 809 (CA5 1979) (airports); *International Society for Krishna Consciousness, Inc.* v. *Rochford,* 585 F. 2d 263 (CA7 1978) (same); *International Society for Krishna Consciousness, Inc.* v. *McAvey,* 450 F. Supp. 1265 (SDNY 1978) (World Trade Center); *International Society for Krishna Consciousness, Inc.* v. *Hays,* 438 F. Supp. 1077 (SD Fla. 1977) (highway rest stops); *United States* v. *Boesewetter,* 463 F. Supp. 370 (DC 1978) (performing arts center).

[10] In *Cox* v. *New Hampshire,* a religious group challenged a local ordinance forbidding street parades without a license. The Court held the requirement constitutional as a reasonable time, place, and manner regula-

proved restrictions of that kind provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in doing so they leave open ample alternative channels for communication of the information." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 771 (1976); see also *Consolidated Edison Co.* v. *Public Service Comm'n,* 447 U. S. 530, 535 (1980). The issue here, as it was below, is whether Rule 6.05 is a permissible restriction on the place and manner of communicating the views of the Krishna religion, more specifically, whether the Society may require the members of ISKCON who desire to practice Sankirtan at the State Fair to confine their distribution, sales, and solicitation activities to a fixed location.

A major criterion for a valid time, place, and manner restriction is that the restriction "may not be based upon either the content or subject matter of speech." *Consolidated Edison Co.* v. *Public Service Comm'n, supra,* at 536.[11]   Rule 6.05

tion: "Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection." 312 U. S., at 574. *Kovacs* v. *Cooper* upheld as applied to a sound truck a content-neutral and nondiscriminatory local ordinance against the emission of loud and raucous noises on the public streets. In *Adderley* v. *Florida,* no constitutional violation was discerned in applying a local trespass ordinance to persons demonstrating on the grounds of a city jail. We rejected the argument "that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please" and held that the "State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." 385 U. S., at 47–48. *Grayned* v. *City of Rockford* sustained as a reasonable time, place, and manner regulation a local ordinance forbidding disturbing noises in the vicinity of a building in which a school is in session.

[11] See *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 771 (1976); *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85, 93–94 (1977); *Police Department of Chicago* v. *Mosley,* 408 U. S.

qualifies in this respect, since, as the Supreme Court of Minnesota observed, the Rule applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds. No person or organization, whether commercial or charitable, is permitted to engage in such activities except from a booth rented for those purposes.[12]

Nor does Rule 6.05 suffer from the more covert forms of discrimination that may result when arbitrary discretion is vested in some governmental authority. The method of allocating space is a straightforward first-come, first-served system. The Rule is not open to the kind of arbitrary application that this Court has condemned as inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view. See *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–153 (1969); *Cox* v. *Louisiana, supra,* at 555–558; *Staub* v. *City of Baxley,* 355 U. S. 313, 321–325 (1958); *Largent* v. *Texas,* 318 U. S. 418 (1943); *Cantwell* v. *Connecticut, supra,* at 304; *Schneider* v. *State,* 308 U. S., at 164; *Hague* v. *CIO,* 307 U. S. 496, 516 (1939).

A valid time, place, and manner regulation must also "serve a significant governmental interest." *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council, supra,* at 771. See *Grayned* v. *City of Rockford, supra,* at 108. Here, the principal justification asserted by the State in support of Rule 6.05 is the need to maintain the orderly movement of

---

92 (1972); *Papish* v. *University of Missouri Curators,* 410 U. S. 667, 670 (1973).

[12] Respondents do argue that because the Rule requires ISKCON to await expressions of interest from fair patrons before it may distribute, sell, or solicit funds, the regulation is not content-neutral in that it prefers listener-initiated exchanges to those originating with the speaker. The argument is interesting but has little force. This aspect of the Rule is inherent in the determination to confine exhibitors to fixed locations, it applies to all exhibitors alike, and it does not invalidate the Rule as a reasonable time, place, and manner regulation.

the crowd given the large number of exhibitors and persons attending the Fair.[13]

The fairgrounds comprise a relatively small area of 125 acres, the bulk of which is covered by permanent buildings, temporary structures, parking lots, and connecting thoroughfares. There were some 1,400 exhibitors and concessionaries renting space for the 1977 and 1978 Fairs, chiefly in permanent and temporary buildings. The Fair is designed to exhibit to the public an enormous variety of goods, services, entertainment, and other matters of interest. This is accomplished by confining individual exhibitors to fixed locations, with the public moving to and among the booths or other attractions, using streets and open spaces provided for that purpose. Because the Fair attracts large crowds, see *supra,* at 643, it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration.

As a general matter, it is clear that a State's interest in protecting the "safety and convenience" of persons using a public forum is a valid governmental objective. See *Grayned* v. *City of Rockford,* 408 U. S., at 115; *Cox* v. *New Hampshire,* 312 U. S., at 574. Furthermore, consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental

---

[13] Petitioners assert two other state interests in support of the Rule. First, petitioners claim that the Rule forwards the State's valid interest in protecting its citizens from fraudulent solicitations, deceptive or false speech, and undue annoyance. See *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980); *Cantwell* v. *Connecticut,* 310 U. S. 296, 306–307 (1940). Petitioners also forward the State's interest in protecting the fairgoers from being harassed or otherwise bothered, on the grounds that they are a captive audience. In light of our holding that the Rule is justified solely in terms of the State's interest in managing the flow of the crowd, we do not reach whether these other two purposes are constitutionally sufficient to support the imposition of the Rule.

interest must be assessed in light of the characteristic nature and function of the particular forum involved. See, e. g., *Grayned* v. *City of Rockford, supra,* at 116–117; *Lehman* v. *City of Shaker Heights,* 418 U. S. 298, 302–303 (1974). This observation bears particular import in the present case since respondents make a number of analogies between the fairgrounds and city streets, which have "immemorially been held in trust for the use of the public and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague* v. *CIO, supra,* at 515. See *Kunz* v. *New York,* 340 U. S. 290, 293 (1951). But it is clear that there are significant differences between a street and the fairgrounds. A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment. The Minnesota Fair, as described above, is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions at the Fair. The flow of the crowd and demands of safety are more pressing in the context of the Fair. As such, any comparisons to public streets are necessarily inexact.

The Minnesota Supreme Court recognized that the State's interest in the orderly movement of a large crowd and in avoiding congestion was substantial and that Rule 6.05 furthered that interest significantly.[14] Nevertheless, the Minnesota Supreme Court declared that the case did not turn on the "importance of the state's undeniable interest in pre-

_____

[14] The court stated that the facts suggested "a situation in which the state's interest in maintaining order is substantial. We have no doubt that Rule 6.05's requirement that all vendors, exhibitors, and concessionaires perform their functions at fixed locations furthers that interest significantly." 299 N. W. 2d, at 83.

venting the widespread disorder that would surely exist if no regulation such as Rule 6.05 were in effect" but upon the significance of the State's interest in avoiding whatever disorder would likely result from granting members of ISKCON an exemption from the Rule. 299 N. W. 2d, at 83. Approaching the case in this way, the court concluded that although some disruption would occur from such an exemption, it was not of sufficient concern to warrant confining the Krishnas to a booth. The court also concluded that, in any event, the Rule was not essential to the furtherance of the State's interest in crowd control, which could adequately be served by less intrusive means.

As we see it, the Minnesota Supreme Court took too narrow a view of the State's interest in avoiding congestion and maintaining the orderly movement of fair patrons on the fairgrounds. The justification for the Rule should not be measured by the disorder that would result from granting an exemption solely to ISKCON. That organization and its ritual of Sankirtan have no special claim to First Amendment protection as compared to that of other religions who also distribute literature and solicit funds.[15] None of our cases suggest that the inclusion of peripatetic solicitation as part of a church ritual entitles church members to solicitation rights in a public forum superior to those of members of other religious groups that raise money but do not purport to ritualize the process. Nor for present purposes do religious organizations enjoy rights to communicate, distribute, and solicit on the fairgrounds superior to those of other organizations having social, political, or other ideological messages to

---

[15] Respondents do not defend the limited approach of the Minnesota Supreme Court. They concede that whatever exemption they were entitled to under the First Amendment would apply to other organizations seeking similar rights to take part in certain protected activities in the public areas of the fairgrounds. See Brief for Respondents 8; Tr. of Oral Arg. 25–26.

proselytize. These nonreligious organizations seeking support for their activities are entitled to rights equal to those of religious groups to enter a public forum and spread their views, whether by soliciting funds or by distributing literature.

If Rule 6.05 is an invalid restriction on the activities of ISKCON, it is no more valid with respect to the other social, political, or charitable organizations that have rented booths at the Fair and confined their distribution, sale, and fund solicitation to those locations. Nor would it be valid with respect to other organizations that did not rent booths, either because they were unavailable due to a lack of space or because they chose to avoid the expense involved, but that would in all probability appear in the fairgrounds to distribute, sell, and solicit if they could freely do so. The question would also inevitably arise as to what extent the First Amendment also gives commercial organizations a right to move among the crowd to distribute information about or to sell their wares as respondents claim they may do.

ISKCON desires to proselytize at the fair because it believes it can successfully communicate and raise funds. In its view, this can be done only by intercepting fair patrons as they move about, and if success is achieved, stopping them momentarily or for longer periods as money is given or exchanged for literature. This consequence would be multiplied many times over if Rule 6.05 could not be applied to confine such transactions by ISKCON and others to fixed locations. Indeed, the court below agreed that without Rule 6.05 there would be widespread disorder at the fairgrounds. The court also recognized that some disorder would inevitably result from exempting the Krishnas from the Rule. Obviously, there would be a much larger threat to the State's interest in crowd control if all other religious, nonreligious, and noncommercial organizations could likewise move freely about the fairgrounds distributing and selling literature and soliciting funds at will.

Given these considerations, we hold that the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest. By focusing on the incidental effect of providing an exemption from Rule 6.05 to ISKCON, the Minnesota Supreme Court did not take into account the fact that any such exemption cannot be meaningfully limited to ISKCON, and as applied to similarly situated groups would prevent the State from furthering its important concern with managing the flow of the crowd. In our view, the Society may apply its Rule and confine the type of transactions at issue to designated locations without violating the First Amendment.

For similar reasons, we cannot agree with the Minnesota Supreme Court that Rule 6.05 is an unnecessary regulation because the State could avoid the threat to its interest posed by ISKCON by less restrictive means, such as penalizing disorder or disruption, limiting the number of solicitors, or putting more narrowly drawn restrictions on the location and movement of ISKCON's representatives. As we have indicated, the inquiry must involve not only ISKCON, but also all other organizations that would be entitled to distribute, sell, or solicit if the booth rule may not be enforced with respect to ISKCON. Looked at in this way, it is quite improbable that the alternative means suggested by the Minnesota Supreme Court would deal adequately with the problems posed by the much larger number of distributors and solicitors that would be present on the fairgrounds if the judgment below were affirmed.

For Rule 6.05 to be valid as a place and manner restriction, it must also be sufficiently clear that alternative forums for the expression of respondents' protected speech exist despite the effects of the Rule. Rule 6.05 is not vulnerable on this ground. First, the Rule does not prevent ISKCON from

practicing Sankirtan anywhere outside the fairgrounds. More importantly, the Rule has not been shown to deny access within the forum in question. Here, the Rule does not exclude ISKCON from the fairgrounds, nor does it deny that organization the right to conduct any desired activity at some point within the forum. Its members may mingle with the crowd and orally propagate their views. The organization may also arrange for a booth and distribute and sell literature and solicit funds from that location on the fairgrounds itself. The Minnesota State Fair is a limited public forum in that it exists to provide a means for a great number of exhibitors temporarily to present their products or views, be they commercial, religious, or political, to a large number of people in an efficient fashion. Considering the limited functions of the Fair and the combined area within which it operates, we are unwilling to say that Rule 6.05 does not provide ISKCON and other organizations with an adequate means to sell and solicit on the fairgrounds. The First Amendment protects the right of every citizen to "reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Kovacs* v. *Cooper,* 336 U. S. 77, 87 (1949). Rule 6.05 does not unnecessarily limit that right within the fairgrounds.[16]

---

[16] Given this understanding of the nature of the Fair, we reject respondents' claim that Rule 6.05 effects a total ban on protected First Amendment activities in the open areas of the fairgrounds. In effect, respondents seek to separate, for constitutional purposes, the open areas of the fairgrounds from that part of the fairgrounds where the booths are located. For the reasons stated in text, we believe respondents' characterization of the Rule is plainly incorrect. The booths are not secreted away in some nonaccessible location, but are located within the area of the fairgrounds where visitors are expected, and indeed encouraged, to pass. Since respondents are permitted to solicit funds and distribute and sell literature from within the fairgrounds, albeit from a fixed location, it is inaccurate to say that Rule 6.05 constitutes a ban on such protected activity in the relevant public forum. Accordingly, the only question is the Rule's validity as a time, place, and manner restriction.

The judgment of the Supreme Court of Minnesota is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE STEVENS join, concurring in part and dissenting in part.

As the Court recognizes, the issue in this case is whether Minnesota State Fair Rule 6.05 constitutes a reasonable time, place, and manner restriction on respondents' exercise of protected First Amendment rights. See *Schad* v. *Mount Ephraim, ante,* at 74–76; *Grayned* v. *City of Rockford,* 408 U. S. 104, 115–116 (1972). In deciding this issue, the Court considers, *inter alia,* whether the regulation serves a significant governmental interest and whether that interest can be served by a less intrusive restriction. See *ante,* at 649–650, 654. The Court errs, however, in failing to apply its analysis separately to each of the protected First Amendment activities restricted by Rule 6.05. Thus, the Court fails to recognize that some of the State's restrictions may be reasonable while others may not.

Rule 6.05 restricts three types of protected First Amendment activity: distribution of literature, sale of literature, and solicitation of funds. See *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 632, 633 (1980); *Murdock* v. *Pennsylvania,* 319 U. S. 105, 108 (1943); *Jamison* v. *Texas,* 318 U. S. 413, 416 (1943); *Schneider* v. *State,* 308 U. S. 147, 160 (1939); *Lovell* v. *Griffin,* 303 U. S. 444, 452 (1938). No individual or group is permitted to engage in these activities at the Minnesota State Fair except from preassigned, rented booth locations. Violation of this Rule constitutes a misdemeanor, and violators are subject to arrest and expulsion from the fairgrounds.

The State advances three justifications for its booth Rule. The justification relied upon by the Court today is the State's

interest in maintaining the orderly movement of the crowds at the fair. *Ante,* at 649–650. The second justification, relied upon by the dissenting justices below, 299 N. W. 2d 79, 87 (Minn. 1980), is the State's interest in protecting its fairgoers from fraudulent, deceptive, and misleading solicitation practices. The third justification, based on the "captive audience" doctrine, is the State's interest in protecting its fairgoers from annoyance and harassment.

I quite agree with the Court that the State has a significant interest in maintaining crowd control on its fairgrounds. See *Grayned* v. *City of Rockford, supra,* at 115–116; *Cox* v. *New Hampshire,* 312 U. S. 569, 574 (1941). I also have no doubt that the State has a significant interest in protecting its fairgoers from fraudulent or deceptive solicitation practices. See *Schaumburg* v. *Citizens for a Better Environment, supra,* at 636; *Virginia Pharmacy Board* v. *Virginia Citizens Consumer Council,* 425 U. S. 748, 771–772 (1976). Indeed, because I believe on this record that this latter interest is substantially furthered by a Rule that restricts sales and solicitation activities to fixed booth locations, where the State will have the greatest opportunity to police and prevent possible deceptive practices, I would hold that Rule 6.05's restriction on those particular forms of First Amendment expression is justified as an antifraud measure. Accordingly, I join the judgment of the Court insofar as it upholds Rule 6.05's restriction on sales and solicitations. However, because I believe that the booth Rule is an overly intrusive means of achieving the State's interest in crowd control, and because I cannot accept the validity of the State's third asserted justification,[1] I dissent from the Court's approval of Rule 6.05's restriction on the distribution of literature.

---

[1] Because fairgoers are fully capable of saying "no" to persons seeking their attention and then walking away, they are not members of a captive audience. They have no general right to be free from being approached. See *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620, 638–639 (1980); *Martin* v. *Struthers,* 319 U. S. 141, 143–144 (1943).

As our cases have long noted, once a governmental regulation is shown to impinge upon basic First Amendment rights, the burden falls on the government to show the validity of its asserted interest and the absence of less intrusive alternatives. See, e. g., *Schneider* v. *State, supra.* The challenged "regulation must be narrowly tailored to further the State's legitimate interest." *Grayned* v. *City of Rockford, supra,* at 116–117. Minnesota's Rule 6.05 does not meet this test.

The Minnesota State Fair is an annual 12-day festival of people and ideas. Located on permanent fairgrounds comprising approximately 125 acres, the fair attracts an average of 115,000 visitors on weekdays and 160,000 on Saturdays and Sundays. Once the fairgoers pay their admission fees, they are permitted to roam the fairgrounds at will, visiting booths, meeting friends, or just milling about. Significantly, each and every fairgoer, whether political candidate, concerned citizen, or member of a religious group, is free to give speeches, engage in face-to-face advocacy, campaign, or proselytize. No restrictions are placed on any fairgoer's right to speak at any time, at any place, or to any person.[2] Thus, if on a given day 5,000 members of ISKCON came to the fair and paid their admission fees, all 5,000 would be permitted to wander throughout the fairgrounds, delivering speeches to

---

[2] A state fair is truly a marketplace of ideas and a public forum for the communication of ideas and information. As one court has stated, a "fair is almost by definition a congeries of hawkers, vendors of wares and services, and purveyors of ideas, commercial, esthetic, and intellectual." *International Society for Krishna Consciousness* v. *State Fair of Texas,* 461 F. Supp. 719, 721 (ND Tex. 1978). See also *International Society for Krishna Consciousness, Inc.* v. *Barber,* 650 F. 2d 430, 444, n. 21 (CA2 1981). Despite the Court's suggestion to the contrary, *ante,* at 651, a fair is surely a "natural and proper plac[e] for the dissemination of information and opinion." *Schneider* v. *State,* 308 U. S. 147, 163 (1939). In no way could I agree that respondents' desired " 'manner of expression is basically incompatible with the normal activity' " of the fair. See *Schad* v. *Mount Ephraim, ante,* at 75, quoting *Grayned* v. *City of Rockford,* 408 U. S. 104, 116 (1972).

whomever they wanted, about whatever they wanted. Moreover, because this right does not rest on Sankirtan or any other religious principle,[3] it can be exercised by every political candidate, partisan advocate, and common citizen who has paid the price of admission. All share the identical

---

[3] I am somewhat puzzled by the Court's treatment of the Sankirtan issue. Respondents' complaint, based on 42 U. S. C. § 1983, alleges that Rule 6.05, on its face and as applied, violates both the Free Exercise and the Free Speech Clauses. In their brief and in oral argument, however, respondents emphasize that they do not claim any special treatment because of Sankirtan, but are willing to rest their challenge wholly upon their general right to free speech, which they concede is identical to the right enjoyed by every other religious, political, or charitable group. Tr. of Oral Arg. 26; Brief for Respondents 19–20, 47–48. There is therefore no need for the Court to discuss Sankirtan.

Having chosen to discuss it, however, the Court does so in a manner that is seemingly inconsistent with prior case law. The parties have stipulated that members of ISKCON have a unique "duty to perform a religious ritual known as *Sankirtan*, which consists of going out into public places, to disseminate or sell religious literature and to solicit contributions to support the publishing, religious, and educational functions of Krishna Consciousness." App. A–32. The Court, however, disparages the significance of this ritual, stating without explanation or supporting authority:

"[ISKCON] and its ritual of Sankirtan have no special claim to First Amendment protection as compared to that of other religions who also distribute literature and solicit funds. None of our cases suggest that the inclusion of peripatetic solicitation as part of a church ritual entitles church members to solicitation rights in a public forum superior to those of members of other religious groups that raise money but do not purport to ritualize the process." *Ante,* at 652 (footnote omitted).

Our cases are clear that governmental regulations which interfere with the exercise of specific religious beliefs or principles should be scrutinized with particular care. See, *e. g., Sherbert* v. *Verner,* 374 U. S. 398, 402–403 (1963). As we stated in *Wisconsin* v. *Yoder,* 406 U. S. 205, 220 (1972), "there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond the power of the State to control, even under regulations of general applicability." I read the Court as accepting these precedents, and merely holding that even if Sankirtan is "conduct protected by the Free Exercise Clause," it is entitled to no greater protection than other forms of expression protected by the First Amendment that are burdened to the same extent by Rule 6.05.

right to move peripatetically and speak freely throughout the fairgrounds.

Because of Rule 6.05, however, as soon as a proselytizing member of ISKCON hands out a free copy of the Bhagavad-Gita to an interested listener, or a political candidate distributes his campaign brochure to a potential voter, he becomes subject to arrest and removal from the fairgrounds. This constitutes a significant restriction on First Amendment rights. By prohibiting distribution of literature outside the booths, the fair officials sharply limit the number of fairgoers to whom the proselytizers and candidates can communicate their messages. Only if a fairgoer affirmatively seeks out such information by approaching a booth does Rule 6.05 fully permit potential communicators to exercise their First Amendment rights.

In support of the crowd control justification,[4] petitioners contend that if fairgoers are permitted to distribute literature, large crowds will gather, blocking traffic lanes and causing safety problems. As counsel for petitioners asserted at oral argument:

> "[I]t seems to me that if you had [distribution] activity going on with not just the Krishnas but 10 or 20 or 30 representatives from perhaps 30 to 60 or 70 groups, that inevitably is going to draw more attention and going to cause or create more or less moving pockets or moving congested crowds . . . . [I]f all of a sudden the crowd becomes aware of the fact that dozens of people are walking around passing out materials and they're going to

---

[4] Other than the "captive audience" justification, see n. 1, *supra,* the only interest seriously asserted by petitioners in support of the restriction on distribution of literature is the State's interest in crowd control. At oral argument, counsel for petitioners expressly declined to advance an anti-littering objective, Tr. of Oral Arg. 16, and virtually conceded that the antifraud rationale would not apply unless the communicator sought to obtain money from the fairgoers. *Id.,* at 14–16, 17–19. See also Brief for Petitioners 24–29.

inevitably be attracted by that. Whereas, they wouldn't be if people were just talking." Tr. of Oral Arg. 18–19. See also Brief for Petitioners 31.

But petitioners have failed to provide any support for these assertions. They have made no showing that relaxation of the booth Rule would create additional disorder in a fair that is already characterized by the robust and unrestrained participation of hundreds of thousands of wandering fairgoers. See *International Society for Krishna Consciousness, Inc.* v. *Barber,* 650 F. 2d 430, 444, n. 22 (CA2 1981). If fairgoers can make speeches, engage in face-to-face proselytizing, and buttonhole prospective supporters, they can surely distribute literature to members of their audience without significantly adding to the State's asserted crowd control problem. Cf. *Martin* v. *Struthers,* 319 U. S. 141, 151 (1943) (Murphy, J., concurring) (invalidating ordinance that banned house-to-house distribution of handbills but did not ban house-to-house proselytizing). The record is devoid of any evidence that the 125-acre fairgrounds could not accommodate peripatetic distributors of literature just as easily as it now accommodates peripatetic speechmakers and proselytizers.[5]

---

[5] Moreover, petitioners' expressed concerns are significantly undermined by three affidavits contained in the record which indicate that the State itself engages in the seemingly forbidden practice of leafletting. Thus, the affidavit of Thomas Kerr states:

"2. On numerous occasions when I entered the [1977 Minnesota State Fair], *the individual taking tickets would give to me a flier* which stated that fairgoers might be approached by roving solicitors, that the fair neither licensed nor sanctioned them, and that complaints against them could be filed with the fair administration. On several occasions, *I also noted individuals who appeared to be state fair employees handing out similar fliers at information booths and concession areas.* On several occasions, *I also noticed that individuals, who appeared to be state fair employees, would begin to distribute similar fliers to fairgoers in areas where I or my fellow ISKCON members were proselytizing* or distributing literature." App. A–40 (emphasis added).

See also Affidavit of Joseph Beca, *id.,* at A–38; Affidavit of David C. Ewert,

Relying on a general, speculative fear of disorder, the State of Minnesota has placed a significant restriction on respondents' ability to exercise core First Amendment rights. This restriction is not narrowly drawn to advance the State's interests, and for that reason is unconstitutional. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker* v. *Des Moines School Dist.*, 393 U. S. 503, 508 (1969). If the State had a reasonable concern that distribution in certain parts of the fairgrounds—for example, entrances and exits—would cause disorder, it could have drafted its Rule to prohibit distribution of literature at those points. If the State felt it necessary to limit the number of persons distributing an organization's literature, it could, within reason, have done that as well.[6] It had no right, however, to ban all distribution of literature outside the booths.[7] A State

"may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those

---

*id.,* at A–43. It is hard to believe the State is seriously concerned about the effects of leafletting, when apparently it too engages in such activity at the State Fair.

[6] Respondents recognize that some limitations may constitutionally be imposed upon their right to distribute literature. Stipulation of Fact #23 states:

"ISKCON, while unwilling to confine its religious activities to a booth, has indicated its willingness to submit to the regulation of its members in their circulation throughout the fairgrounds to proselytize, distribute and sell literature, and solicit contributions." *Id.,* at A–36.

In addition, paragraph 11 of respondents' complaint states:

"ISKCON's devotees have tried to allay any fears Defendants might have that their religious activity might be disruptive to normal Fair activities by offering to wear identifying name tags at all times, to limit the number of devotees at the State Fair Grounds, to approach only consenting patrons, to refrain from engaging Fair patrons in conversation near entrances or exits to buildings or exhibits or in areas where there

interests without unnecessarily interfering with First Amendment freedoms. . . . 'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . .'" *Schaumburg v. Citizens for a Better Environment,* 444 U. S., at 637, quoting *NAACP v. Button,* 371 U. S. 415, 438 (1963).

Accord, *Grayned v. City of Rockford,* 408 U. S., at 116–117.

Because I believe that the State could have drafted a more narrowly drawn restriction on the right to distribute literature without undermining its interest in maintaining crowd control on the fairgrounds, I would affirm that part of the judgment below that strikes down Rule 6.05 as it applies to distribution of literature.

JUSTICE BLACKMUN, concurring in part and dissenting in part.

For the reasons stated by JUSTICE BRENNAN, I believe that Minnesota State Fair Rule 6.05 is unconstitutional as applied to the distribution of literature.[1] I also agree, however, that the Rule is *constitutional* as applied to the sale of literature and the solicitation of funds. I reach this latter conclusion by a different route than does JUSTICE BRENNAN for I am not persuaded that, under the Court's precedents, the State's interest in protecting fairgoers from fraudulent solicitation

---

are lines or queues, and to identify themselves to Fair officials, including police officials." *Id.,* at A–6.

See also Tr. of Oral Arg. 30, 34–35.

[7] As the Minnesota Supreme Court concluded:

"The state's interest can be adequately served by means less restrictive of First Amendment rights. Conduct that tends to create disorder on the fairgrounds may be specifically prohibited." 299 N. W. 2d 79, 84 (1980).

[1] Like JUSTICE BRENNAN, I would not reach the question whether respondents can claim an exemption from the operation of Rule 6.05 because of their adherence to the doctrine of Sankirtan.

or sales practices justifies Rule 6.05's restrictions of those activities.[2]

In *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 636–637 (1980), the Court stressed that a community's interest in preventing fraudulent solicitations must be met by narrowly drawn regulations that do not unnecessarily interfere with First Amendment freedoms. It there held that possibility of fraud in "door-to-door" or "on-street" solicitations could be countered "by measures less intrusive than a direct prohibition on solicitation," such as disclosure provisions and penal laws prohibiting fraudulent misrepresentations. *Id.,* at 637–638. I see no reason why the same considerations are not applicable here. There is nothing in this record to suggest that it is more difficult to police fairgrounds for fraudulent solicitations than it is to police an entire community's streets; just as fraudulent solicitors may "melt into a crowd" at the fair, so also may door-to-door solicitors quickly move on after consummating several transactions in a particular neighborhood. Indeed, since respondents have offered to wear identifying tags, see App. A–6, and since the fairgrounds are an enclosed area, it is at least arguable that it is easier to police the fairgrounds than a community's streets.

Nonetheless, I believe that the State's substantial interest in maintaining crowd control and safety on the fairgrounds does justify Rule 6.05's restriction on solicitation and sales activities not conducted from a booth. As the Court points out, *ante,* at 651, "[t]he flow of the crowd and demands of

---

[2] It should be stressed that Rule 6.05 does not prevent respondents from wandering throughout the fairgrounds and directing interested donors or purchasers to their booth. See Brief for Petitioners 35–36. Thus, it is in fact only the exchange of money, rather than the solicitation *per se* of contributions or of purchases, that is limited to a booth. See 299 N. W. 2d 79, 86 (Minn. 1980) (opinion dissenting in part). Accordingly, I use the terms "solicitation" and "sales" to connote only the actual exchange of money, rather than the act of requesting that the fairgoer purchase literature or make a contribution at the booth.

safety are more pressing in the context of the Fair" than in the context of a typical street. While I agree with JUSTICE BRENNAN that the State's interest in order does not justify restrictions upon distribution of literature, I think that common-sense differences between literature distribution, on the one hand, and solicitation and sales, on the other, suggest that the latter activities present greater crowd control problems than the former. The distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead, the recipient is free to read the message at a later time. For this reason, literature distribution may present even fewer crowd control problems than the oral proselytizing that the State already allows upon the fairgrounds. In contrast, as the dissent in the Minnesota Supreme Court observed, sales and the collection of solicited funds not only require the fairgoer to stop, but also "engender additional confusion . . . because they involve acts of exchanging articles for money, fumbling for and dropping money, making change, etc." 299 N. W. 2d 79, 87 (1980). Rules restricting the exchange of money to booths have been upheld in analogous contexts, see, e. g., *International Society for Krishna Consciousness of Atlanta* v. *Eaves,* 601 F. 2d 809, 828–829 (CA5 1979) (Atlanta airports), and for similar reasons I would uphold Rule 6.05 insofar as it applies to solicitation and sales.