**METROMEDIA, INC., Plaintiff,**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, et al., Defendants.**

Civ. A. No. J–79–1769.

United States District Court,
D. Maryland.

May 18, 1982.

Jervis S. Finney, William L. Balfour, Baltimore, Md., for plaintiff.

Benjamin L. Brown, Richard K. Jacobsen, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Metromedia, Inc., owner of eight billboards in the Midtown Belvedere Urban Renewal Area, brought this action challenging a Baltimore City ordinance of June 28, 1977, which amends the urban renewal plan for the Midtown Belvedere area. The ordinance contains provisions on the kind and size of outdoor advertising signs permitted in the area, including a ban on off-site billboards. Metromedia attacked the ordinance on several grounds of federal and state law, including a claim that it violates the First Amendment to the United States Constitution. It filed a motion for summary judgment, with an accompanying affidavit, and the City has responded, also filing an affidavit. Oral argument was held October 15, 1981.

The narrow question presented on the motion is whether the ordinance violates the First Amendment and, specifically, how the recent Supreme Court decision in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981), applies to it. *Metromedia* is the first case in which the Supreme Court has fully addressed the constitutionality under the First Amendment of a city ordinance regulating the billboards. *See id.* at 2917 (Burger, C. J., dissenting). Applying it to this case is

not easy, however, because there is no majority opinion and because the Baltimore City ordinance differs in some significant respects from the San Diego ordinance. This Court has found no subsequent case applying *Metromedia* to other ordinances.

### The Supreme Court's ruling in Metromedia, Inc. v. City of San Diego

The City of San Diego enacted an ordinance banning all outdoor advertising display signs except signs identifying the premises on which the sign was located or "advertising goods manufactured or produced or services rendered on the premises upon which signs were placed." Ordinance No. 10795 (New Series), quoted in *Metromedia*, 101 S.Ct. at 2885 n. 1. Signs advertising products, services, businesses or events sold, produced or occurring off the premises on which the sign was located were prohibited. *See id.* Several exceptions, including government signs, were also enacted.

The California Supreme Court upheld the ordinance, rejecting an argument that it was facially invalid under the First Amendment. The Supreme Court reversed the judgment, but without a majority opinion. The judgment ruling was reached with a plurality of four justices and two justices concurring in the judgment.

Justice White, writing for the plurality, found the ordinance constitutional insofar as it restricted commercial advertising to on-site advertising. 101 S.Ct. at 2894–95. He found that the City's interests in traffic safety and esthetics were advanced by the ordinance; in making that determination, he rejected a contention that the City had failed to demonstrate a connection between billboards and traffic safety or esthetics. *Id.* at 2892–93. The plurality believed, however, that the ban on noncommercial advertising was invalid under the First and Fourteenth Amendments. The City had permitted on-site commercial advertising, but not on-site noncommercial advertising.[1] *Id.* at 2895.

---

1. The plurality was apparently reading the on-site advertising exception as not applicable to

any noncommercial signs, such as those advertising noncommercial services performed there,

In addition, by excepting some noncommercial signs from its ban, San Diego had impermissibly regulated the content of noncommercial speech. *Id.* at 2896. The plurality concluded that the ordinance was invalid on its face. *Id.* at 2899.

Justice Brennan, with whom Justice Blackmun joined, concurred in the judgment, but applied a different analysis to the San Diego ordinance. Believing that the practical effect of the ordinance was a total ban of billboards, he stated the test for a total ban: a showing that a sufficiently substantial governmental interest is directly furthered by the ban and that a narrower restriction, *i.e.*, less than a total ban, would be less effective in the achievement of the interest. *Id.* at 2903. Justice Brennan found that the City had failed to provide adequate justification for its restrictions. It had failed to show, for example, that banning billboards actually furthered traffic safety and that billboards presented more significant esthetic problems than other permitted uses, particularly in commercial and industrial areas. *Id.* at 2903–04.

Justice Brennan disapproved of the plurality's distinction between commercial and noncommercial billboards. He read the ordinance as permitting identifying and advertising signs by noncommercial, as well as commercial, occupants of premises and disagreed with the implication of the plurality opinion that an ordinance banning commercial billboards but allowing noncommercial ones would be constitutional. *Id.* at 2906–09.

### The Baltimore ordinance and the affected signs

The ordinance that is challenged here, No. 374, was enacted June 28, 1977, as an amendment of the Midtown Belvedere Area urban renewal plan. Among its provisions are restrictions on signs that may be displayed in the area. The basic provision is contained in section 3(4)(a):

No signs other than those identifying the property where they are installed or identifying the use conducted therein shall be permitted. Advertising by material or product manufacturers shall not be permitted except as primary identification of an establishment.

On-premises signs are restricted in size, location on the building and type.

The restrictions on signs are contained in a section providing standards for the outside appearance of buildings within this urban renewal area. Other provisions deal with the appearance of building facades, awnings, windows, roofs and screening of parking, storage and loading areas. Designs for improvements, modifications, repairs, rehabilitation, and painting affecting building exteriors, as well as for signs, must be submitted for approval to the Commissioner of Planning of the Department of Housing and Community Development.

The affidavit of W. R. Walker, regional real estate development manager for Metromedia, establishes that plaintiff owns eight billboards in the Midtown Belvedere Area, located on property leased by it from land owners. The billboards were erected before the June 28, 1977 ordinance was enacted, and complied with prior standards. Metromedia received violation notices from the City in June 1979 requiring removal of its billboards.

Metromedia makes its billboards available to commercial and noncommercial advertisers. The signs change periodically, usually monthly. Signs advertising charity fundraising events, religious organizations, and a political campaign are representative of noncommercial advertising appearing on the subject billboards in recent years. On August 17, 1981, according to the affidavit of Franz J. Vidor, Director of Planning of the Department of Housing and Community Development, one of the eight billboards advertised a noncommercial message of the Kidney Foundation. Mr. Vidor states that a ratio of 7 to 1 for commercial to noncommercial messages is not typical, that the percentage of noncommercial messages appearing on billboards throughout the City is lower. The exact percentages are not

101 S.Ct. 2895, 2899; *see id.* at 2906–07 (Brennan, J., concurring in judgment).

known in this case, nor are they important. It seems to be conceded that most of the advertisers are commercial, but that there are noncommercial ones as well.

The general facts concerning the nature of plaintiff's billboards and the kinds of messages presented on them are identical to those in *Metromedia, Inc. v. City of San Diego*; indeed, the same plaintiff is involved. There are, however, several differences in the two ordinances. Although both prohibit off-premises advertising signs, the Baltimore City ordinance permits only signs identifying the occupant of a building and restricts the size, type, and location of signs. The San Diego ordinance permitted identification signs and signs advertising the business or goods made on the premises.[2] The Baltimore ordinance contains no specific exceptions, as did the San Diego ordinance, although temporary nonconforming signs are apparently allowed. The Baltimore ordinance covers only the Midtown Belvedere Area, not the entire city. In addition, the challenged ban on signs is part of an ordinance containing detailed regulations concerning the appearance of building exteriors within the area.

### Legal discussion

■ Under recent Supreme Court cases concerning regulation of speech or of conduct involving or implicating First Amendment values, the general question to be asked is whether an ordinance furthers a substantial interest of the City and whether the interest could be served by a narrower restriction. *E.g., Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). The restriction must not be based on content or subject matter of speech or, even if putatively neutral, be subject to governmental action that will restrict speech by reason of content because of discretion vested in officials. *E.g., Heffron*, 452 U.S. at 649, 101 S.Ct. at 2565.

In most respects the Baltimore ordinance is content neutral. Unlike the San Diego ordinance, at least as read by the plurality in *Metromedia*, commercial and noncommercial signs are equally limited to identifying signs of appropriate size and type. There are no other specific exceptions to the ordinance, favoring certain content over others. The approval authority given to the Director of Planning is related to conformance with the size, kind and other appearance regulations of the ordinance. Content is, however, regulated in the restriction of commercial and noncommercial signs to ones identifying the premises. The questions then must be asked whether the City has shown a sufficient justification for the ordinance and whether the interest could be served by narrower restrictions.

The City justifies the ordinance on the grounds of traffic safety and esthetics. The Director of Planning has stated in an affidavit that those interests were actually considered by the Planning Department in recommending the high standards for the Midtown Belvedere Urban Renewal Area. It is apparent, from the provisions of the ordinance itself, that development of an esthetically pleasing, homogeneous area was the major concern of the City. There are numerous restrictions and standards designed to restore the original appearance of buildings in the area and to eliminate unsightly features. For example, the original structure and decorative features of building faces, such as cornices, are to be restored or replaced to match original materials and construction. Unsightly features such as air conditioning units, roof equipment and structures, antennas, and parking areas are to be matched to the building or screened from view as much as possible. The prohibition of billboards, rooftop signs, and all flashing or moving signs except barber poles and the restrictions on size are part of this scheme to restore buildings in the neighborhood to their original appearance and make them more attractive.

---

**2.** Whether both types of signs were permitted for noncommercial owners was the subject of some dispute. See note 1, *supra*.

This Court may take note of the relationship between concerns of traffic safety and esthetics and a ban on outdoor advertising structures. *Metromedia*, 101 S.Ct. at 2892–94 (plurality opinion); *Contra, Metromedia*, 101 S.Ct. at 2903 & n. 7 (Brennan, J., concurring in judgment). The ban on outdoor advertising signs furthers the City's interests in traffic safety and esthetics, primarily esthetics.

In one sense, the ban on billboards is narrow, because it only applies to one area of the City. Outdoor advertising signs are permitted in many other areas, and it can be argued that only a total ban on signs within the area can accomplish the City's goal of making the area esthetically pleasing and homogeneous in appearance.

The ordinance is, however, defective in one of the ways that the *Metromedia* plurality found the San Diego ordinance defective, in its discrimination against noncommercial messages.[3] Noncommercial owners or occupiers of buildings may identify their premises to the same extent that commercial tenants may. In this sense, noncommercial speech is permitted on an equal basis with commercial speech. It is, however, unequal in one of the ways the San Diego ordinance was unequal—an owner or occupier within the area may affix a sign identifying his premises but may not affix a sign displaying his ideas or those of others. The Baltimore ordinance contains a number of restrictions imposed, and justifiable, on esthetic grounds. The question remains why, if an owner complies with the size, style, and location requirements for signs, he should not be allowed to communicate a message other than identification of his premises. The City has advanced no arguments, and there appear to be none, why its interests in traffic safety and esthetics could not be served by a more narrowly drawn ordinance, regulating size and appearance of signs but not their content.

I therefore find, based on the plurality opinion in *Metromedia*, that the ordinance is facially invalid. Summary judgment will be entered in favor of plaintiff.

---

**3.** This was one of the bases on which the plurality in *Metromedia* found that the San Diego ordinance was unconstitutional on its face. 101 S.Ct. at 2895. Another factor was that the exceptions to the statute permitted some kinds of noncommercial speech but not others, thus impermissibly regulating content. *Id.* at 2896. It is not clear whether the result would have been the same had not both factors been present, but the answer seems to be that it would have been.