BYE, Circuit Judge,
dissenting.
In my view, the Board’s regulation was a content-neutral time, place, and manner restriction and was narrowly tailored to serve a significant government interest which also provided ample alternative channels of communication. I would affirm the judgment of the district court.
First, I believe the Board demonstrated a significant government interest in restricting literature distribution during the Festival to maintain the orderly flow of people, provide access for security and emergency vehicles, and facilitate Festival activities. The Supreme Court has recognized a state’s interest in protecting the safety and convenience of persons using a public forum. See Heffron v. Int’l Soc’y for Krishna Consciousness, Inc., 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).
In Heffron, members of the Krishna religion desired to distribute literature on the fairgrounds during the Minnesota State Fair. Id. at 642-43, 101 S.Ct. 2559. A fairgrounds rule mandated such literature be distributed only from fixed locations. Id. at 643,101 S.Ct. 2559. Like the policy at issue in this case, “the Rule d[id] not prevent organizational representatives from walking about the fairgrounds and communicating the organization’s views with fair patrons in face-to-face discussions,” but required literature be distributed from a booth. Id. at 643^44, 101 S.Ct. 2559. With respect to the significance of the governmental interest involved, the Court held “[bjecause the Fair attracts large crowds, it is apparent that the State’s interest in the orderly movement and control of such an assembly of persons is a substantial consideration. As a general matter, it is clear that a State’s interest in protecting the ‘safety and convenience’ of persons using a public forum is a valid governmental objective.” Id. at 650, 101 S.Ct. 2559.
In my view, the Board’s interest is indistinguishable from the interest identified in Heffron. Allowing any and all participants to distribute literature outside a booth would impede arrival and access of other Festival attendees, as well as paramedics, security personnel, police, and the delivery of supplies to Festival vendors. Highlighting the need for such access is the fact that there were nine ambulance calls to the Festival on one day. The Board also noted a past incident in which the distribution of literature outside of booths caused pedestrian congestion, security problems, and complaints from participants.
The majority criticizes the participants “who complained simultaneously that (1) literature distribution outside of booths caused problematic congestion, and (2) they too should have been permitted to distribute literature from outside their booths, thereby creating more problematic congestion.” However, instead of undercutting the Board’s position, such complaints highlight the real tension faced by the Board. If one person is allowed to ignore sensible regulations limiting literature distribution to designated areas, more people will have an incentive to ignore the same regulations. Such will lead to greater congestion and a frustration of all participants’ free speech activity, especially the Festival participants who went to the *1103 trouble of obtaining and operating a booth within the regulations. Indeed, this outcome could lead to less speech, not more.
The majority has concluded the regulation is underinclusive because the Board permitted at least one street performer on the pathways in 2011, though at oral argument, counsel for the Board asserted the Board was unaware of any performers at the Festival. The majority then speculates as to street performers being more likely to cause congestion than literature distributors even though it is unclear whether a street performer has ever caused congestion or other problems in previous years. On the other hand, the Festival has encountered problems with literature distributors in the past and has developed a sensible plan for managing those situations. It is unfair to expect the Board to have a plan in place to address a problem which has never materialized.
The majority also criticizes the Festival’s efforts to collect donations in 2012, reasoning such “[s]olicitation is a more disruptive form of speech than literature distribution.” However, no such evidence was presented that these solicitors caused or would cause congestion or other similar problems. Solicitation was limited to designated areas “near entrances,” which is a sensible limitation.
Next, in my view, the Board’s regulation is narrowly tailored to serve its significant government interest. In order to meet the narrowly tailored requirement, a restriction on speech must not “burden substantially more speech than is necessary to further the government’s legitimate interest.” Ward v. Rock Against Racism, 491 U.S. 781, 799, 109 S.Ct. -2746, 105 L.Ed.2d 661 (1989). “[Wjhen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the [government’s] goal.” Hill v. Colorado, 530 U.S. 703, 726, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).
Here, Johnson is not prevented from distributing literature during the Festival—he is merely restricted to doing so at designated locations. As the Supreme Court has noted, “the First Amendment does not guarantee the right to communicate one’s views at all times and places or in any manner that may be desired.” Hef-fron, 452 U.S. at 647,101 S.Ct. 2559. Like the Hejfron policy, the Board’s regulation permits Johnson—and anyone else—to walk about the park, engage in conversations with festival-goers, and wear clothing or carry a sign displaying any message he desires. It merely limits one type of activity (i.e., the distribution of materials) to a fixed location (i.e., literature drop area), which was made available to any interested party and located adjacent to the Festival area.
Finally, my belief is the Board has provided ample alternative channels of communication. Johnson can attend the Festival, engage in conversations with other attendees, wear expressive clothing, carry a sign conveying his message, and distribute Bibles from both the “materials drop” booth within the park and from his own booth outside the Festival. Johnson argues his preferred form of speech is personally handing a Bible to someone in the Festival, but the fact that one method of communication is preferred does not render alternatives necessarily inadequate. See Members of City Council of L.A v. Taxpayers for Vincent, 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (“To the extent that the posting of signs on public property has advantages over [other] forms of expression, there is no reason to believe that these same advantages cannot be obtained through other means.”).
Weighing these factors, I do not believe Johnson has demonstrated a likelihood of *1104 success on the merits of his claim and, thus, is not entitled to injunctive relief.
For the foregoing reasons, I respectfully dissent.