Robert B. SCADRON, Jeffrey Scadron, and Barry Scadron d/b/a Scadron Enterprises, an Illinois General Partnership a/k/a Scadron Outdoor Advertising, Plaintiffs,

v.

CITY OF DES PLAINES, a municipal corporation, Defendant.

No. 89 C 7591.

United States District Court, N.D. Illinois, E.D.

March 20, 1990.

Gary E. Dienstag, Edward M. Springer and Donald W. Devitt, Springer, Casey, Dienstag & Devitt, P.C., Chicago, Ill., for plaintiffs.

Mathias W. Delort, Mark H. Sterk and Burton S. Odelson, Odelson & Sterk, Ltd., Evergreen Park, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

This lawsuit concerns the validity of a municipal billboard regulation scheme under both federal and state law. Plaintiff Scadron Enterprises ("Scadron") is an Illinois partnership engaged in the business of leasing real property for the purpose of leasing or donating billboard space to commercial and noncommercial advertisers. The defendant is the City of Des Plaines, Illinois ("the City"), which has an ordinance affecting the use and construction of billboards. Scadron's principal claims are that the City's regulation scheme is inconsistent with state law concerning highway advertising, that it violates Scadron's free speech rights, and that it has been discriminatorily applied so as to violate Scadron's equal protection rights. Pending is the City's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the City's motion to dismiss is granted as to all claims other than the equal protection claim.

### II. STATUTORY BACKGROUND

#### A. *Illinois Highway Advertising Control Act*

The Illinois Highway Advertising Control Act of 1971, Ill.Rev.Stat. ch. 121 ¶¶ 501 *et seq.* ("HACA") was enacted to implement the Highway Beautification Act of 1965, 23 U.S.C. § 131, which conditions federal highway grants on state prohibitions of most signs within 660 feet of major highways. *See National Advertising Co. v. City of Rolling Meadows*, 789 F.2d 571, 575 (7th Cir.1986). The Highway Beautification Act requires states to prohibit most new off-premises signs, and begin to take down old ones, in areas adjacent to federally-funded highways. An exception is provided for areas zoned as industrial or commercial, which must be governed by rules determined by agreement between the states and the Secretary of Transportation. HACA embodies Illinois's agreement with the Secretary. *See id.*

HACA establishes certain limits on signs erected within 660 feet of federally-funded highways. Section 6.01, Ill.Rev.Stat. ch. 121 § 506.01, provides:

Size. No sign may be erected which exceeds 1,200 square feet in area, 30 feet in height and 60 feet in length, including border and trim, but excluding ornamental base or apron, supports and other structural members....[1]

Section 6.02, Ill.Rev.Stat. ch. 121 § 506.02, sets certain requirements with respect to the lighting of signs, and section 6.03, Ill. Rev.State. ch. 121 § 506.03, sets requirements with respect to their spacing.[2]

Section 1 of HACA, Ill.Rev.Stat. ch. 121 § 501, the findings and purposes clause, provides that the regulations in Section 6 are proper and adequate to carry out HACA's purposes, "more severe restrictions being inconsistent with customary use and ineffective to accomplish the purposes of this Act."[3]

Section 7, Ill.Rev.Stat. ch. 121 § 507, addresses local regulation of advertising signs:

In zoned commercial and industrial areas, whenever a State, county or municipal zoning authority has adopted laws or ordinances, which include regulations with respect to the size, lighting and spacing of signs, which regulations are consistent with the intent of this Act and with customary use, then from and after

the effective date of such regulations, and so long as they shall continue in effect, the provisions of Section 6 shall not apply to the erection of signs in such areas.

**B. City Ordinances**

Section 10.5.5 of the Des Plaines Zoning Ordinance restricts advertising designed to be viewed from a limited access highway:

10.5.5 LOCATION OF ADVERTISING DEVICES: No advertising device shall be erected, constructed, relocated or maintained:

10.5.5.1 If such advertising device is designed to have or has the advertising thereon maintained primarily to be viewed from a limited access highway.

10.5.5.2 If such advertising device, because of its location, size, nature or type, constitutes or tends to constitute a hazard to the safe and efficient operation of vehicles upon a limited access highway, or creates a condition which endangers the safety of persons or property therefrom.

Also in issue is the Des Plaines Sign Code. Section 4–5–1 of the Sign Code, the purposes and findings clause, emphasizes aesthetics, safety, and the interests of local businesses.[4] Section 4–5–2 of the Sign Code defines "Sign" as:

every sign, billboard, ground sign, wall sign, roof sign, illuminated sign, projec-

---

**1.** This section regulates the size of the sign face only, in contrast to some local ordinances, which regulate the overall height of the sign, including any ornamental base or apron, supports, and structural members.

**2.** Section 6.03 provides in part: "Along interstate highways and expressways no two sign structures on the same side of the highway shall be erected less than 500 feet apart. Along primary highways other than expressways no two sign structures on the same side of the highway shall be erected less than 300 feet apart (100 feet inside incorporated municipalities)."

**3.** Section 1 reads as follows:
"The General Assembly finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to Interstate highways and primary highways should be regulated in order to protect the public investment in such highways, to promote the recreational value of public travel, to preserve natural beauty and to promote the

reasonable, orderly and effective display of such signs, displays and devices.
"The General Assembly further finds and declares that outdoor advertising is a legitimate, commercial use of private property adjacent to roads and highways; that outdoor advertising is an integral part of the business and marketing function, and an established segment of the national economy which serves to promote and protect private investments in commerce and industry and should be allowed to operate in business areas; and that the regulatory standards set forth in Section 6 of this Act are consistent with customary use in this State and will properly and adequately carry out each and all of the purposes of this Act, more severe restrictions being inconsistent with customary use and ineffective to accomplish the purposes of this Act."

**4.** Section 4–5–1 provides:
... The intent is to safeguard the general welfare of the property owner, to preserve the beauty of the community while balancing this

ting sign, temporary sign, marquee, awning, canopy, and street clock, ... [including] any announcement, declaration, demonstration, display illustration or insignia used to advertise or promote the interests of any person when the same is placed out of doors in view of the general public.

Section 4–5–3 of the Sign Code makes it unlawful to erect any sign without first obtaining a permit.

The principal operative language of the Sign Code at issue in this case is section 4–5–14, which provides:

COMMERCIAL SIGN NO LONGER ADVERTISING BONA FIDE BUSINESS; REMOVAL: Any commercial sign which no longer advertises a bona fide business conducted on the premises where said sign is located, shall be taken down and removed by the owner, agent or person having the beneficial use of the building or structure or property upon which such sign may be found, or application shall

be made for a permit to change the face of the sign to advertise a bona fide business conducted or a product sold on said premises, within ten (10) days after written notification from the Building Inspector. Upon failure to comply with such notice within the time specified in such notice, the City shall initiate such legal proceedings as may be required to compel the removal of said sign(s) and the recovery of any cost incurred in connection therewith, including legal fees.[5]

Section 4–5–15 exempts certain signs from the provisions of the Sign Code, including real estate signs no larger than eight square feet which advertise the premises on which they are located; certain signs painted on the exterior surface of a building or structure; bulletin boards no larger than eight square feet for public, charitable or religious institutions which are located on the premises of such institutions; memorial signs or tablets; and traffic or other municipal signs.[6]

---

with growth, development and commercial pursuits. In setting the standards, the following findings are made:
(A) That a multiplicity of signs is distracting to motorists and a hazard to vehicular pedestrian traffic.
(B) That a proliferation of off-premises commercial signs obscures the legitimate effort of local business establishments to reasonably identify the location and nature of their businesses.
(C) That it is a legitimate public purpose to limit commercial signs in the City to those reasonably necessary to identify local businesses. Such limitations are established so as to:
  1. Limit distraction to motorists and reduce the danger to other motorists and pedestrians.
  2. Control and abate the unsightly use of buildings and land and to enhance the appearance of the landscape.
  3. Preserve the beauty of the landscape and residential and commercial architecture.

5. Section 4–5–14 replaces an earlier provision which read:
    It shall be unlawful for any person, firm, or corporation to permit any sign now or hereafter existing which no longer advertises a bona fide business conducted, or a product sold, or which advertises business which is not being conducted on or adjacent to the premises on which the sign is located....
That provision was ruled unconstitutional in *Metromedia, Inc. v. City of Des Plaines*, 26 Ill. App.3d 942, 326 N.E.2d 59 (1st Dist.1975) (*"Des Plaines"*).

6. Section 4–5–15 reads as follows:
    EXEMPTIONS: The provisions and regulations of this Chapter shall not apply to the following signs; provided, however, said signs shall be subject to the provisions of Section 4–5–10 [regarding unsafe signs].
    (A) Real estate signs not exceeding eight (8) square feet in area which advertise the sale, rental or lease of the premises upon which said signs are located only.
    (B) Professional name plates not exceeding one (1) square foot in area.
    (C) Signs painted on the exterior surface of building or structure; provided, however, if said signs have raised borders, letters, characters, decorations or lighting appliances, they shall be subject to the provisions of Section 4–5–29 and all applicable provisions of this Chapter.
    (D) Bulletin boards not over eight (8) square feet in area for public, charitable or religious institutions when the same are located on the premises of said institutions.
    (E) Signs denoting the architect, engineer, or contractor when placed upon work under construction, and not exceeding sixteen (16) square feet in area.
    (F) Occupational signs denoting only the name and profession of an occupant in a commercial building, public institutional building or dwelling house, and not exceeding two (2) square feet in area.
    (G) Memorial signs or tablets, names of buildings and date of erection when cut into any masonry surface or when constructed of bronze or other incombustible materials.

Section 4–5–28 of the Sign Code sets certain size limitations for ground signs. Section 4–5–42 provides that "[n]o sign shall be allowed or maintained if the sign shall in any way violate the Illinois Highway Advertising Control Act of 1971, as amended." The effect of sections 4–5–28 and 4–5–42 is to limit ground signs to a maximum of 480 square feet in area and 35 feet in height.[7]

## III. FACTS

For the purposes of this motion, the Court accepts as true the factual allegations in the complaint. On April 13, 1988, Scadron leased certain property within the City for the purpose of constructing a billboard. The property abuts the entrance ramp to I–294, a federally-supported interstate highway. The property is zoned for business and commercial uses. The proposed billboard has two sign faces, each of which would measure 20 feet by 60 feet. It would be within 660 feet of I–294 and would not exceed 30 feet in height exclusive of base and supports. Scadron alleges that the billboard is consistent with the standards contained in HACA and that Scadron has received a permit from the State of Illinois.

Scadron applied to the City's Department of Municipal Government for a building permit to allow the construction of the billboard. That application was denied on December 19, 1988. Scadron appealed to the City Council, which denied the appeal and a request for a variation on October 2, 1989. Scadron alleges that the City has, on several occasions, granted permits to other applicants to construct billboards similar in height and location to the one proposed by Scadron.

Scadron filed this lawsuit on October 6, 1989, alleging that the City's Sign Code violates the free speech, due process and equal protection provisions of the First, Fifth and Fourteenth Amendments of the U.S. Constitution and is preempted by HACA.[8] The City, in its motion to dismiss, argues that Scadron's challenges must fail as a matter of law.

## IV. CONSTITUTIONALITY OF THE ORDINANCES

### A. Supreme Court Decisions

The starting point for any analysis of ordinances regulating the size and placement of advertising signs must be the Supreme Court's decisions in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) ("*San Diego*"), and *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) ("*Taxpayers*"). In *San Diego*, the Court struck down an ordinance which prohibited most outdoor advertising signs. The ordinance exempted two types of signs: (1) "onsite signs," defined as signs "designating the name of the owner or occupant of the premises upon which such signs are placed, or identifying such premises; or signs advertising goods manufactured or produced or services rendered on the premises upon which such signs are placed;" and (2) certain specific types of signs, described by the Court as including "government signs; signs located at public bus stops; signs manufactured, transported, or stored within the city, but not used for advertising purposes; commemorative historical plaques; religious symbols; signs within shopping malls; for sale and for lease signs; signs on public and commercial vehicles; signs depicting time, temperature, and news; approved temporary, off-premises, subdivision directional signs; and

(H) Traffic or other Municipal signs, legal notices, railroad crossing signs, danger, and such temporary, emergency or nonadvertising signs as may be approved by the City Council.... (I) Historical Sign: When any parcel of property or facility is designated by the Federal, State or local government as a historical location, sight [sic: site], or that a historical activity occurred thereon, the original sign or a sign similar to the original sign that was posted at the location shall be permitted to be erected....

7. The size limitations established in section 4–5–28 are complex, and they vary in accordance with the size of the lot on which they are placed. The size limits may be as small as 120 square feet in area and 20 feet in height. The largest size limits are 480 square feet in area and 35 feet in height.

8. Scadron's complaint originally included a fifth amendment "taking" argument, but that claim has been dismissed by stipulation.

'[t]emporary political campaign signs.' " 453 U.S. at 494–95, 101 S.Ct. at 2886.

The Court found that the ordinance was unconstitutional, but was unable to reach a majority as to the reasoning. The four-Justice plurality (White, Stewart, Marshall and Powell) believed that a complete ban on commercial signs would be permissible. *Id.* at 512, 101 S.Ct. at 2895. However, they believed that the ordinance was invalid because it discriminated among signs on the basis of their content: it drew an impermissible distinction between commercial and noncommercial onsite advertising (permitting the former but not the latter), *Id.* at 512–13, 101 S.Ct. at 2895, and it permitted certain types of noncommercial signs while prohibiting other noncommercial signs, *Id.* at 514–17, 101 S.Ct. at 2896–97. Two Justices (Brennan and Blackmun) disagreed with the plurality's finding that the ordinance drew content-based distinctions, but believed that the ordinance was invalid because the city had failed to adequately justify the restrictions on free speech. *Id.* at 528, 101 S.Ct. at 2903. Three Justices (Burger, Stevens and Rehnquist) agreed with the plurality that a total ban on offsite commercial billboards would be permissible, but disagreed with the plurality's conclusion that the ordinance drew impermissible content-based distinctions. *Id.* at 541, 101 S.Ct. at 2916–17 (Stevens); *Id.* at 555–69, 101 S.Ct. at 2917–24 (Burger); *Id.* at 569–70, 101 S.Ct. at 2924–25 (Rehnquist). Accordingly, they would have upheld the ordinance.

From the various opinions in *San Diego*, certain majority views may be distilled. Seven Justices (White, Stewart, Marshall, Powell, Burger, Stevens and Rehnquist) believed that a complete ban on off-premises commercial advertising would be permissible. Five Justices (Brennan, Blackmun, Burger, Stevens and Rehnquist) believed that the limited exceptions to the ordinance's general prohibition of off-premises

advertising were too insubstantial to constitute discrimination on the basis of content.

In *Taxpayers, supra,* an organization which desired to place political campaign flyers on utility pole crosswires unsuccessfully challenged an ordinance which prohibited the posting of signs on public property. Because the ordinance was enforced without regard to the content of the signs, the Court applied the test for content-neutral regulation of speech. The Court found that the ordinance was justified by the city's aesthetic interest and was narrowly tailored to serve that interest. 466 U.S. at 805–10, 104 S.Ct. at 2129–32. Significantly, the Court noted that in *San Diego* it had "considered the city's interest in avoiding visual clutter, and seven Justices explicitly concluded that this interest was sufficient to justify a prohibition of billboards." 466 U.S. at 807, 104 S.Ct. at 2130. The Court expressly reaffirmed this position. *Id.*

## B. Constitutionality of Sign Code

### 1. Interpretation of the Sign Code

■ The parties urge very different interpretations of the City's Sign Code. According to the City, the ordinance does not ban off-premises advertising signs. It merely subjects those signs to certain restrictions, including size limits. The original ordinance did purport to ban off-premises advertising signs in section 4–5–14, but that provision was held unconstitutional and was later replaced with the current version.[9] The existing section 4–5–14 merely ensures the removal of on-premises advertising signs which are obsolete because they advertise items which are no longer available on the premises.

Scadron argues that section 4–5–14 implicitly bans all off-premises advertising signs. It further contends that because the ordinance exempts certain noncommercial signs, it draws distinctions based on content and is therefore invalid for the reasons that the ordinance in *San Diego* was held unconstitutional.[10]

9. *See supra* at n. 5.

10. It is not evident from the complaint exactly why the City denied Scadron's application for a permit. The proposed billboard clearly violates the ordinance's size limitations. Because the City may well have denied a permit on that basis alone, it is very possible that the alleged

ban on off-premises signs was not a ground for the denial of a permit. Conceivably, therefore, the Court need not address the issue of whether the statute includes a total ban on off-premises signs if it determines that the size limitations are valid. However, the alleged ban raises significant First Amendment issues, and the issues

The City relies primarily on the plain language of the ordinance or, more precisely, on the absence of any plain language banning off-premises advertising signs. The absence of any express prohibition is a strong indication that the ordinance does not ban off-premises advertising signs. *Cf. Board of Education v. Regional Board of School Trustees*, 121 Ill.App.3d 848, 852, 460 N.E.2d 100, 103, 77 Ill.Dec. 241, 244 (5th Dist.1984) ("action taken by drafters of legislation is a more definite expression of their thoughts than is their failure to act"). The Court will not interpret an ordinance to mean something it does not say unless there are clear indications that the ordinance is intended to have a meaning contrary to its text. Scadron argues that such clear indications exist for a number of reasons.

Scadron emphasizes that the ordinance contains exemptions for certain types of signs.[11] These exemptions, Scadron argues, are meaningless unless they are interpreted as exemptions to an implicit ban on off-premises signs; if there were no general prohibition, there would be no need for exemptions. The Court disagrees. The ordinance does contain size restrictions and other regulations concerning the maintenance of signs. The exemption provision, section 4–5–15, states that certain signs are exempt from all of the provisions of the Sign Code with the exception of one provision relating to unsafe signs. Accordingly, the exemption provision does have meaning in the absence of a general prohibition of off-premises signs; the types of signs listed in section 4–5–15 are exempt from the size and maintenance requirements that apply to other off-premises signs.

Scadron also argues that a ban may be inferred from the ordinance's purposes clause and from its definition of signs. Again, the Court cannot agree. The ordinance does state, among other purposes, that "it is a legitimate public purpose to limit commercial signs in the City to those reasonably necessary to identify local busi-

nesses." (Section 4–5–1.) Because the only provision in the ordinance which concerns off-premises advertising is section 4–5–14, Scadron contends that the intent of that section must be to fulfill this purpose by limiting commercial signs to those reasonably necessary to identify local businesses, and thus by prohibiting off-premises signs. The Court is unwilling to read a provision of the ordinance in a manner inconsistent with its plain language solely to make it more suitable to one of the purposes motivating the ordinance as a whole. The Court also fails to see how the ordinance's definition of a sign [12] supports Scadron's argument. Scadron correctly points out that the definition encompasses both commercial and noncommercial speech. However, that does not make it more likely that the statute is intended to ban off-premises signs.

Scadron further argues that section 4–5–14 must be interpreted as a ban on off-premises advertising signs because the City's contrary interpretation of the provision leads to absurd results. *Cf. Application of United States*, 563 F.2d 637, 642 (7th Cir.1977) (statutes should be interpreted to avoid absurd results). One such result, Scadron contends, is that an owner of vacant land could erect a sign containing off-premises advertising, but an owner of property containing a sign which advertises a defunct on-premises business could not. In other words, owners of signs which once advertised on-premises goods are subject to greater restrictions than other property owners. The rights of a property owner who wishes to display a billboard are thus dependent on whether the billboard previously advertised goods sold on the premises. The City disagrees with this reading, arguing that a property owner who has an obsolete on-premises sign may simply replace the sign with an off-premises sign. The language of the provision does not expressly support the City's reading: it allows only the two alternatives of removing the sign or converting it to a valid

---

are closely intertwined with the issues concerning the size limitations. Accordingly, the Court will proceed to examine Scadron's arguments with respect to the alleged ban on off-premises signs.

11. *See supra* at n. 6.

12. *See supra* at 5.

on-premises sign. It is possible, however, that the City applies the provision in accordance with the interpretation it urges here. If indeed the provision has the effect which Scadron sets forth, it may be unconstitutional.[13] Even if that is the case, however, that does not mean that the statute must be read as containing an implicit ban on off-premises signs. If the Court wishes to avoid this arguably absurd and unconstitutional reading, it may cure the problem by interpreting the provision as either banning off-premises signs for everybody, or as allowing the third alternative to owners of obsolete on-premises signs. Of these two interpretations, the latter requires a less dramatic departure from the statute's plain language. Accordingly, the Court does not view the alleged absurd result offered by Scadron as warranting an interpretation of the ordinance by which it bans all off-premises signs.

Finally, Scadron argues that the legislative history of section 4–5–14 supports its position.[14] Scadron relies on the following passage in *Des Plaines, supra,* which struck down the original provision:

> By the terms of the provision of the ordinance in the present case, a distinction is made between on-premises and off-premises outdoor advertising signs. *No express finding is set forth in the ordinance presenting the reasons for such a classification.* While it is certain that in the exercise of its police powers a municipality may create classifications, they must have some relation to the object of the power. An inspection of this ordinance convinces us that the classification made in the challenged section is arbitrary, capricious, and prohibitive on its face.

26 Ill.App.3d at 945–46, 326 N.E.2d at 62 (emphasis added).[15] Scadron contends that

---

**13.** An ordinance which made a somewhat similar distinction was struck down in *Ackerley Communications of Massachusetts, Inc. v. City of Somerville,* 878 F.2d 513 (1st Cir.1989). In that case, the city had exempted from the restrictions of its sign ordinance signs which had carried no off-premises advertising for a year prior to the ordinance's enactment. The court found that the distinction between speakers based on their past speech was impermissible.

The Court does not find it necessary to actually determine the effect of section 4–5–14 on owners of defunct on-premises signs. Scadron does not allege that it is an owner of such a sign, and thus Scadron is not adversely affected by the distinction it views the ordinance as making. Generally, "a litigant only has standing to vindicate his own constitutional rights." *Taxpayers for Vincent,* 466 U.S. at 796, 104 S.Ct. at 2124. There is an exception in the free speech context where laws "are written so broadly that they may inhibit the constitutionally protected speech of third parties." *Id.* at 799, 104 S.Ct. at 2125. The important factor in determining whether this exception applies in a given case is the "likelihood that the statute's very existence will inhibit free expression." *Id.* at 799, 104 S.Ct. at 2126. This case does not fall within that exception. The ordinance does not criminalize speech which has already been performed, and the Court does not view it as chilling the exercise of speech by owners of obsolete on-premises billboards. If the City begins enforcement procedures against such property owners, or if it denies them permits, those property owners may then seek judicial enforcement of their free speech rights.

**14.** *See supra* at n. 5.

**15.** Similar results have been reached in other cases in reliance on the First Amendment. In *Matthews v. Town of Needham,* 764 F.2d 58 (1st Cir.1985), the court invalidated a bylaw which prohibited off-premises signs but permitted on-premises signs. Because the bylaw had the effect of prohibiting owners of private property from displaying signs with political messages, the court found that it drew an impermissible content-based distinction. In *Metromedia, Inc. v. Mayor and City Council of Baltimore,* 538 F.Supp. 1183 (D.Md.1982), the court also struck down an ordinance which banned off-premises signs but permitted on-premises signs. The court held that the distinction between signs which advertised the premises themselves and signs which advertised other ideas was an impermissible content-based discrimination against non-commercial speech. 538 F.Supp. at 1187.

Both of those decisions are questionable in light of the Supreme Court's apparent unanimity in *San Diego* in concluding that the distinction between on-premises and off-premises signs was legitimate. *See San Diego,* 453 U.S. at 511–12, 101 S.Ct. at 2894–95 (plurality); *Id.* at 526, 101 S.Ct. at 2902 (Brennan, J., concurring); *Id.* at 541, 101 S.Ct. at 2909–10 (Stevens, J., dissenting in part); *Id.* at 564, 101 S.Ct. at 2921–22 (Burger, C.J., dissenting). *See also Id.* at 535, 101 S.Ct. at 2906–07 (Brennan, J., concurring) (arguing that the ordinance's on-premises exemption encompassed noncommercial as well as commercial speech).

Accordingly, other courts have rejected First Amendment challenges to ordinances which ban nearly all off-premises signs while permitting on-premises signs. *See Georgia Advertising,*

the City attempted to remedy this problem with its attempted ban on off-premises signs simply by making the express findings in section 4–5–1(A)–(C),[16] in the hope that such findings would be sufficient to validate the ban on off-premises signs. Again, the Court is unwilling to construe section 4–5–14 contrary to its express language and to look for a hidden meaning (a ban on off-premises signs) in order to make the statute serve its purposes more effectively. Scadron's arguments with respect to the statute's purposes simply are not strong enough to justify a departure from the ordinance's language. In light of the substantial change that was made in the language of section 4–5–14, particularly the elimination of the clause forbidding any sign "which advertises a business which is not being conducted on or adjacent to the premises on which the sign is located," the Court cannot agree that the City merely re-enacted its ban on off-premises advertising signs. The City has demonstrated that it knows how to forbid off-premises advertising if it so wishes, and the Court will treat as determinative the City's failure to include such a provision in its current statute. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 522–23, 104 S.Ct. 1188, 1194, 79 L.Ed.2d 482 (1984).[17]

### 2. Content Discrimination

Scadron argues that the sign ordinance is invalid because it uses the content of signs as the basis for determining whether or not they are permitted. The ordinance thus violates, in Scadron's view, the principle that "the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Taxpayers*, 466 U.S. at 804, 104 S.Ct. at 2128. *See also San Diego*, 453 U.S. at 514, 101 S.Ct. at 2896. Scadron emphasizes that the restrictions are applied only to certain signs, while other signs are exempted by section 4–5–15 on the basis of their content. Relying on *San Diego*, Scadron contends that this content-based distinction makes the ordinance unconstitutional.

The Court rejects this argument for reasons stated in the concurring and dissenting opinions of *San Diego*. As noted above,[18] although the plurality found that the exemptions constituted an impermissible content-based distinction, a majority of the Justices stated that the limited exceptions to the San Diego ordinance's general prohibition on billboards were too insignificant to rise to the level of content-based discrimination. Thus Justice Brennan, joined by Justice Blackmun, stated in his concurrence:

> [M]y view is that the *practical* effect of the San Diego ordinance is to eliminate the billboard as an effective medium of communication for the speaker ... and that the exceptions do not alter the overall character of the ban....

The characterization of the San Diego regulation has more than semantic implications, for it suggests a First Amendment analysis quite different from the

---

*Inc. v. City of Waynesville*, 833 F.2d 43 (4th Cir.1987); *Major Media of the Southeast, Inc. v. City of Raleigh*, 792 F.2d 1269 (4th Cir.1986), *cert. denied*, 479 U.S. 1102, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987); *City of Lake Wales v. Lamar Advertising Association*, 414 So.2d 1030, 1031 (Fla.1982).

**16.** *See supra* at n. 4. The City argues that the purpose clause was not added after *Des Plaines* but rather was enacted in contemplation of the original section 4–5–14 which was struck down in *Des Plaines*. The Court is unable to determine which party is correct with respect to the timing, but assumes for purposes of this opinion that Scadron's version is accurate.

**17.** If the sign code were indeed intended to prohibit all off-premises advertising, the Court would likely invalidate that prohibition anyway

because the ordinance, insofar as it does prohibit off-premises signs, does so in such an ambiguous and contorted manner that it leaves advertisers and sign companies with no comprehensible standard of conduct and thus is impermissibly vague. *See Smith v. Goguen*, 415 U.S. 566, 578, 94 S.Ct. 1242, 1249, 39 L.Ed.2d 605 (1974).

The Court also notes that if the ordinance did ban all off-premises signs, the constitutional issues with respect to that ban (other than vagueness) would be the same as those raised by the ordinance's size restrictions, because Scadron's constitutional challenge to the size restrictions is premised on its claim that the restrictions are so severe as to constitute an effective prohibition of all billboard advertising. The analysis applied in parts B and C of this Part would therefore apply equally to such a total ban.

**18.** *See supra* at 10–11.

plurality's. Instead of relying on the exceptions to the ban to invalidate the ordinance, I would apply the tests this Court has developed to analyze content-neutral prohibitions of particular media of communication.

453 U.S. at 525–27, 101 S.Ct. at 2901–02 (emphasis in original). Chief Justice Burger, dissenting, wrote:

In a bizarre twist of logic, the plurality seems to hold that *because* San Diego has recognized the hardships of its ordinance on certain special needs of citizens and, therefore, exempted a few narrowly defined classes of signs from the ordinance's scope ... the ordinance violates the First Amendment....

The exceptions San Diego has provided ... are few in number, are narrowly tailored to peculiar public needs, and do not remotely endanger freedom of speech.... More generally, ... San Diego has not preferred any viewpoint and, aside from these limited exceptions, has not allowed some subjects while forbidding others.

Where the ordinance does differentiate among topics, it simply allows such noncontroversial things as conventional signs identifying a business enterprise, time-and-temperature signs, historical markers, and for sale signs. It borders—if not trespasses—on the frivolous to suggest that, by allowing such signs but forbidding noncommercial billboards, the city has infringed freedom of speech.... The danger of San Diego's setting the agenda of public discussion is not simply *de minimis;* it is nonexistent.

*Id.* at 564–65, 101 S.Ct. at 2922. Justice Stevens stated in his partial dissent:

If one is persuaded, as I am, that a wholly impartial total ban on billboards would be permissible, it is difficult to understand why the exceptions in San Diego's ordinance present any additional threat to the interests protected by the First Amendment....

To the extent that the exceptions relate to subject matter at all, I can find no suggestion on the face of the ordinance that San Diego is attempting to influence public opinion or to limit public debate on particular issues. Except for the provi-

sion allowing signs to be used for political campaign purposes for limited periods ... none of the exceptions even arguably relates to any controversial subject matter. As a whole they allow a greater dissemination of information than could occur under a total ban. Moreover, it was surely reasonable for the city to conclude that exceptions for clocks, thermometers, historic plaques, and the like, would have a lesser impact on the appearance of the city than the typical large billboards.

*Id.* at 488–89, 101 S.Ct. at 2916–17. Justice Rehnquist, also dissenting, added: "Nor do I believe that the limited exceptions contained in the San Diego ordinance are the types which render this statute unconstitutional." *Id.* at 570, 101 S.Ct. at 2925.

The exemptions specified in the sign ordinance in this case are similar to those at issue in *San Diego.* Chief Justice Burger's statement that the exemptions in the San Diego ordinance are "narrowly tailored to peculiar public needs, and do not remotely endanger freedom of speech," is equally applicable to the exemptions in this case. The Court does not view the exemptions as sufficient to alter the general nature of the restrictions or to constitute a content-based distinction among speakers.

3. Validity of Content–Neutral Provisions

Because the sign ordinance is content-neutral, it is valid if:

it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), quoted in *Taxpayers,* 466 U.S. at 805, 104 S.Ct. at 2129. Scadron argues that the ordinance fails this test or, at the very least, that there are questions of fact

concerning the reasonableness of the restrictions.

The analysis of this issue need not be extensive. The *San Diego* opinion is clear on the sufficiency of safety and aesthetic concerns to justify banning billboards. *See San Diego*, 453 U.S. at 507–12, 101 S.Ct. at 2892–95 (plurality); *Id.* at 552, 101 S.Ct. at 2915 (Stevens, J., dissenting in part); *Id.* at 559–61, 101 S.Ct. at 2919–20 (Burger, C.J., dissenting); *Id.* at 570, 101 S.Ct. at 2924–25 (Rehnquist, J., dissenting). *See also Georgia Outdoor Advertising, Inc. v. City of Waynesville*, 833 F.2d 43, 46 (4th Cir.1987) (without examining empirical evidence, holds that goals of safety and aesthetics, or even aesthetics alone, justify billboard ban); *Metromedia, Inc. v. Mayor and City Council of Baltimore*, 538 F.Supp. 1183, 1186–87 (D.Md.1982) (without examining empirical evidence, finds safety and aesthetic interests sufficient to justify ban on outdoor advertising signs). The City in this case has elected not to ban advertising signs altogether, but rather to restrict their size. This decision is directly related to safety and aesthetic goals; it is eminently reasonable for the City to determine that small signs do not pose the same traffic safety risks or aesthetic concerns as do large billboards. If, as Scadron alleges, the restrictions are so severe as to amount to a total ban, that ban is still valid under the reasoning of *San Diego*.[19] The Court holds that the size restrictions are valid as reasonable content-neutral restrictions.[20]

### C. Constitutionality of Zoning Ordinance

█ Scadron has not argued that the Zoning Ordinance in this case discriminates on the basis of the content of speech. Furthermore, the ordinance simply designates one type of area in which advertising devices are not permitted. It thus imposes less of a restriction on speech than would a total ban on such signs. Under the reasoning of *San Diego* and *Taxpayers*, the City's interests in traffic safety and aesthetics would be sufficient to justify a total ban on billboards. The only question, then, is whether it is a permissible time, place or manner restriction when the city provides that such signs may not be placed near limited access highways. The Court does not hesitate to conclude, again under the reasoning of the opinions in *San Diego* and *Taxpayers*, that such a distinction is per-

---

**19.** *See supra* at 11.

**20.** The disharmonious views expressed in the various *San Diego* opinions has led to a somewhat incongruous result. A statute which is identical to the San Diego ordinance must be invalidated if only the result, and not the reasoning, in *San Diego* is followed. Yet if the various majority views are distilled and applied, such a statute would be upheld. A majority of the justices believed that the statute was a content-neutral billboard ban; another majority believed that a content-neutral billboard ban would be constitutional; and yet the Court invalidated the statute. As now Chief Justice Rehnquist observed, "it is a genuine misfortune to have the Court's treatment of the subject be a virtual Tower of Babel, from which no definitive principles can be drawn." 453 U.S. at 569, 101 S.Ct. at 2924.

Generally, the proper approach in applying a fragmented Supreme Court decision is to adopt the "position taken by those Members who concurred in the judgments on the narrowest grounds." *Village of Bollingbrook v. Citizens Utilities Co.*, 864 F.2d 481, 483 (7th Cir.1988), citing *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). *See also Shields v. Burge*, 874 F.2d 1201, 1203–04 (7th Cir.1989); *Cygnar v. City of Chicago*, 865 F.2d 827, 837–38 (7th Cir.1989). That principle cannot be applied to the *San Diego* case because the reasoning of the concurrence is not simply narrower or broader than that of the plurality; rather, it is directly contrary to that of the plurality. However, that principle does indicate that we should look beyond the result and examine the reasoning of the opinions in an effort to determine those views which draw support from a majority of the Court's members. Accordingly, this Court has chosen to piece together the majority views in *San Diego* rather than to simply follow the result. *But see National Advertising Co. v. City of Orange*, 861 F.2d 246 (9th Cir.1988) (without discussing concurring or dissenting opinions, court holds that *San Diego* requires invalidation of ordinance which prohibits off-premises signs because it exempts such signs as certain governmental signs and flags, memorial tablets, and recreational signs). Furthermore, this Court has the benefit of nine years of hindsight, during which time the law has developed and personnel changes have taken place in the Supreme Court. (For example, Justice O'Connor, who joined the Court after the *San Diego* decision, joined the majority opinion in *Vincent*.) This Court finds that the *San Diego* opinions must be interpreted as supporting the constitutionality of the ordinance at issue in this case.

missible. Given the higher speeds of vehicles traveling on interstate highways, a city could reasonably conclude that special consideration should be given to minimization of distractions along such highways. Similarly, the substantial authority of governmental bodies to advance aesthetic interests, *see, e.g., Taxpayers,* 466 U.S. at 806–07, 104 S.Ct. at 2129–30, makes this Court loathe to second-guess inherently subjective aesthetic judgments of governmental bodies. There is no allegation that the City "has as an ulterior motive the suppression of speech," *San Diego,* 453 U.S. at 510, 101 S.Ct. at 2894 (plurality), and the court finds that the City's ordinance cannot be said to be more suspect simply because it has chosen to permit advertising signs in areas of the City not adjacent to highways rather than to enact the total ban permissible under *San Diego.* The City could reasonably conclude that limited access highways should be treated differently for aesthetic purposes than other areas of the City.

## V. VALIDITY OF ORDINANCES UNDER STATE LAW

■ Pursuant to Article VII, § 6(a) of the Illinois Constitution, the City is a "home rule" unit of government because it has a population of over 25,000. A home rule municipality may enact measures pertaining to its own government and affairs, while non-home rule municipalities have only the authority expressly granted to them by statute and powers incidental to such authority. *See Pesticide Public Policy Foundation v. Village of Wauconda,* 117 Ill.2d 107, 111–12, 510 N.E.2d 858, 860–61, 109 Ill.Dec. 790, 792–93 (1987). An ordinance enacted by a home rule municipality is valid if it is of local concern and is not preempted by a state law which specifically provides that the state's regulation of the issue is exclusive. Ill. Const. (1970) Art. VII § 6(a), (g)-(i). Although its complaint raises only the preemption issue, in its brief Scadron argues that the City's

sign ordinance is invalid because it meets neither requirement.

### A. Local Concern

Scadron relies on provisions in the Highway Beautification Act and HACA in support of its argument that regulation of advertising signs is not a matter of local concern. The Highway Beautification Act states that erection and maintenance of outdoor advertising signs adjacent to the interstate and primary highway system should be controlled. 23 U.S.C. § 131(a).[21] Section 1 of HACA recognizes that outdoor advertising is a legitimate use of property which promotes investments in commerce and industry.[22]

The Court does not find these provisions controlling on the issue of whether regulation of billboards is a legitimate concern of home rule municipalities. The Highway Beautification Act states that regulation is important; this supports, rather than undercuts, the interests of municipalities in further regulating billboards. The language in the purposes clause of HACA merely lends support to the balancing of interests which the state legislature sought to perform. HACA itself, in section 7, explicitly recognizes that municipalities share an interest in regulating advertising signs. Furthermore, although five Illinois appellate cases have discussed the preemption issue (*infra* at 1449–1451), none of those cases have held that billboard regulation is not a matter of local concern. Three of them, *Dingeman Advertising, Inc. v. Village of Mt. Zion,* 157 Ill.App.3d 461, 510 N.E.2d 539, 109 Ill.Dec. 671 (4th Dist.1987), *National Advertising Co. v. Village of Downers Grove,* 166 Ill.App.3d 58, 519 N.E.2d 502, 116 Ill.Dec. 610 (2d Dist.1988) ("*Downers Grove*"), and *Universal Outdoor, Inc. v. Village of Elk Grove,* 194 Ill.App.3d 303, 550 N.E.2d 1254, 141 Ill. Dec. 208 (1st Dist.1990), have, implicitly if not expressly, found that billboard regula-

---

**21.** "The Congress hereby finds and declares that the erection and maintenance of outdoor advertising signs, displays, and devices in areas adjacent to the Interstate System and the primary system should be controlled in order to protect the public investment in such highways, to pro-

mote the safety and recreational value of public travel, and to preserve natural beauty." 23 U.S.C. § 131(a).

**22.** *See supra* at n. 3.

tion is an appropriate exercise of home rule powers. The Court concludes that, under Illinois law, the City's Sign Code addresses matters of local concern and thus satisfies the first requirement of a valid home rule ordinance.

### B. Preemption

Inartful drafting of HACA has led to an ongoing dispute over the extent to which it preempts local regulation of advertising signs. The argument in favor of preemption proceeds as follows: Section 6.01 of HACA [23] contains restrictions on the size of sign faces. Section 7 [24] states that section 6 does not apply where a local municipality has adopted "size, lighting and spacing" regulations which "are consistent with the intent of this Act and with customary use." Section 1,[25] the findings clause, states that the restrictions in section 6 "are consistent with customary use" and that "more severe restrictions [are] inconsistent with customary use." Accordingly, municipalities may not enact size limits which are more restrictive than those in section 6 because more restrictive limits are inconsistent with customary use (section 1) and because municipalities are prohibited from enacting restrictions which are inconsistent with customary use (section 7).[26]

Municipalities seeking to regulate signs respond by emphasizing section 7's express provision that section 6 does not restrict a municipality's power to place restrictions on sign size. If section 1's discussion of "customary use" is read as forbidding size limits more restrictive than those in section 6, it destroys section 7's provision that section 6 does not apply to sign ordinances which are otherwise valid.

Several courts have examined sign ordinances enacted by Illinois municipalities to determine whether those ordinances are preempted by HACA, and not all of those courts are in agreement. Although none of the cases concerned an ordinance identical to that passed by the City, the issues raised are very similar to the issues raised

here, and a detailed examination of those cases is essential.

In *Dolson Outdoor Advertising Co. v. City of Macomb*, 46 Ill.App.3d 116, 360 N.E.2d 805, 4 Ill.Dec. 692 (3d Dist.1977), a non-home rule municipality had passed an ordinance which excluded off-premises advertising from industrial and business districts. After quoting the relevant portions of HACA, but without extensive analysis, the court held:

> We believe it is clear from the provisions of the statute quoted, as well as from other provisions, that off-premise advertising is not only permitted, but specifically authorized by the Act and consequently we are unable to find any provision in the Act which authorizes non-home rule municipalities to prohibit off-premise advertising signs within the limits of the municipality. Where the General Assembly has established applicable standards governing the regulation of certain areas, municipalities are not generally authorized to enact more restrictive regulations in the absence of specific authority to do so. *American Smelting & Refining Co. v. Knox*, 60 Ill.2d 133, 324 N.E.2d 398 [ (1974) ].

46 Ill.App.3d at 121, 360 N.E.2d at 808, 4 Ill.Dec. at 695. The Court concluded that:

> the prohibition of off-premise signs from its business zoning districts is contrary to the authority conferred upon the city by the Highway Advertising Control Act and consequently the ordinance is invalid in this respect.

*Id.* at 121, 360 N.E.2d at 809, 4 Ill.Dec. at 696.

In *Ridge Outdoor Advertising v. Indian Head*, 129 Ill.App.3d 525, 472 N.E.2d 850, 84 Ill.Dec. 713 (1st Dist.1984), the court considered a non-home rule municipality's ordinance limiting signs to an overall height of forty feet above the level of the street or the ground, whichever was higher. The proposed sign at issue was to be

---

**23.** *See supra* at 1438–1439.

**24.** *See supra* at 1439.

**25.** *See supra* at 1439.

**26.** Of course, this argument only applies to signs, such as that proposed by Scadron, which are within 660 feet of a federally-funded highway and which are thus covered by HACA. *See supra* at 2.

built at the intersection of a raised tollway and a road that was not raised. If, as the municipality argued, the height of the sign was to be measured from the road rather than the tollway, the ordinance would limit the overall height of a billboard to such an extent that if its sign face was 30 feet high, as permitted by § 6.01 of HACA, not all of the sign face would be visible from the tollway. The court stated that a "sign regulatory ordinance must be construed in a manner calculated both to extend protection to moving motorists ... and to avoid more severe restrictions set forth in [HACA]." 129 Ill.App.3d at 529, 472 N.E.2d at 852, 84 Ill.Dec. at 715. The court found that the municipality's interpretation was inconsistent with HACA, and determined that the overall height of the proposed sign must be measured from the height of the tollway. *Id.* at 529, 472 N.E.2d at 853, 84 Ill.Dec. at 716.

In *National Advertising Co. v. City of Rolling Meadows*, 789 F.2d 571 (7th Cir. 1986) ("*Rolling Meadows*"), the court was presented with a home rule municipality's sign ordinance which, among other things, limited the height of signs to 20 feet above curb level, limited their surface area to 200 square feet, and prohibited off-premises signs altogether. The district court had held that the ordinance was authorized by section 7 of HACA, and that reading sections 1 and 6 as requiring the municipality to allow signs of the size permitted in section 6 would drain section 7 of its meaning. *See Rolling Meadows*, 789 F.2d at 575.

The court of appeals disagreed:

> This is a false dichotomy. Section 6.01 regulates the permitted area of the sign "excluding ornamental base or apron, supports and other structural members." It is possible to say that "customary use" (and hence the rules of § 6.01 operating as local law) must govern the size of a sign's face, but that cities may regulate other aspects of the signs. They may, for example, regulate the supports of the signs, and thus the total height of the structure. They also may regulate the design of signs—say, by requiring (or forbidding) signs to have a "colonial" appearance. And of course they may forbid signs altogether, or regulate signs

as they please, in areas more than 660 feet from the highway or in places that are not zoned for industrial or commercial uses.

*Id.* at 576. Under this interpretation of HACA, the court held that the ordinance was invalid because the city had "tried to exceed the permitted scope of regulation by banning billboards from some permitted places and restricting their size in all places." *Id.* at 576. The court found support for this result in the *Dolson* and *Ridge* cases.

Up to this point, every court which had considered the issue had held that local size regulations more restrictive than those contained in HACA were preempted by HACA. The next two cases reached a contrary result. In *Dingeman Advertising, Inc. v. Village of Mt. Zion*, 157 Ill.App.3d 461, 510 N.E.2d 539, 109 Ill.Dec. 671 (4th Dist.), *appeal denied*, 116 Ill.2d 552, 515 N.E.2d 105, 113 Ill.Dec. 296 (1987), a home rule municipality's ordinance prohibited all signs larger than 150 square feet in area. The court undertook a more extensive analysis of HACA than had any of the previous courts and determined that the various provisions in HACA were in conflict with each other:

> Without the second paragraph of section 1 of the Act, it would be clear that municipalities could provide restrictions on size as long as they are within the maximum and not inconsistent with "customary use." If "customary use" is, in fact, the upper limits provided by section 6, then section 7 is a nullity, as is the provision in section 4.04 referring to section 7. In fact, the use of the term "customary use" in the legislation would be a nullity. A conflict definitely exists within the Act. If "customary use" must be construed to be the maximum limitations provided by section 6, then municipalities have no authority as to size, lighting and spacing. If "customary use" is not so limited, the municipalities may have effective zoning control over size, lighting, and spacing.

157 Ill.App.3d at 463, 510 N.E.2d at 540, 109 Ill.Dec. at 672. In light of this conflict, the court turned to the purposes of HACA

and the results of the alternative interpretations. The court concluded that the position of the advertising company challenging the ordinance

> would result in an absurd and unjust result. If signs in municipal areas could only be limited to the maximum limitation of the Act, the purpose of the Act "to preserve natural beauty and to promote the reasonable, orderly and effective display of such signs, displays and devices" would be frustrated. We hold that, insofar as section 1 and section 7 conflict, section 7 controls and uphold Mt. Zion's right to regulate the size, lighting and spacing of advertising signs consistent with customary use.

*Id.* at 465, 510 N.E.2d at 541, 109 Ill.Dec. at 673. The court distinguished *Dolson* on the basis that "the ordinance in *Dolson* did not provide for selective prohibition but rather provided a blanket prohibition of off-premises signs." *Id.* at 464, 510 N.E.2d at 541, 109 Ill.Dec. at 673. The court distinguished *Rolling Meadows* on the ground that the *Rolling Meadows* court had not had adequate briefing on the preemption issue.[27] *Id.*

In *National Advertising Co. v. Village of Downers Grove*, 166 Ill.App.3d 58, 519 N.E.2d 502, 116 Ill.Dec. 610 (2d Dist.) (*"Downers Grove"*), *appeal denied*, 121 Ill.2d 572, 526 N.E.2d 832, 122 Ill.Dec. 439 (1988), the court was presented with a home rule municipality's sign ordinance which contained several limitations which were more restrictive than HACA, including a prohibition of signs in excess of 200 square feet in size and 20 feet in height. The Court noted the split between *Dingeman* on one side and *Dolson* and *Rolling Meadows* on the other, and expressly adopted the reasoning of *Dingeman*. The court stated:

> As the *Dingeman* court has noted, in an effort to preserve the receipt of Federal highway funds, yet still address the interest of the advertising sign industry in erecting more and larger billboards and the interest of municipalities in restricting their use near the highways, a conflict was inadvertently written into the Highway Advertising Control Act. In resolving the conflict between section 1 of the Act, which protects the advertising industry, and section 7, which offers protection to a municipality which wishes to place additional limitations on billboards, we agree with the *Dingeman* court that section 7 should control, in the absence of any legislative determination of which conflict should prevail.

166 Ill.App.3d at 62, 519 N.E.2d at 504, 116 Ill.Dec. at 612.

In *Universal Outdoor, Inc. v. Village of Elk Grove*, 194 Ill.App.3d 303, 550 N.E.2d 1254, 141 Ill.Dec. 208 (1st Dist.1990), an advertising company sought to erect seven signs on various sites. The proposed signs were 672 square feet in area and ranged from 30 to 60 feet in height. The signs were prohibited by the terms of a local ordinance, the provisions of which are not set forth in the opinion. The court held that the ordinance was not preempted by HACA and affirmed the dismissal of the complaint. The court found that sections 1, 6 and 7 were in conflict, and agreed with *Dingeman*'s reasoning. The court stated that it was "not persuaded" by the cases decided before *Dingeman*. It also distinguished *Dolson* on the basis that *Dolson* was not concerned with a home rule municipality, and it specifically declined to follow *Rolling Meadows*.

These conflicting precedents raise the issue of the nature of this Court's duty in a diversity case where questions of state law arise. The Court must, of course, apply the substantive law of the state of Illinois. *See Erie Railroad Co. v. Tompkins*, 304

---

**27.** Neither of these distinctions is entirely convincing. In *Rolling Meadows,* the court did note that the original briefing had been inadequate, but it stated that additional briefing was ordered in order to alleviate this problem. 789 F.2d at 574.

With respect to *Dolson,* it would appear that the blanket prohibition at issue in that case would be upheld under the reasoning used of *Dingeman.* Nowhere does the *Dingeman* opinion state that there is a limit on the power of municipalities to adopt more restrictive regulations. If the *Dingeman* court really intended to distinguish *Dolson* on this basis, then it seems to implicitly hold that at some unspecified point a municipality's regulations can become so inconsistent with HACA that they must be invalidated.

U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The question before the Court is how to determine what that state law is when the Illinois Supreme Court has issued no definitive interpretation. There are three possible answers in this case: (1) the Court is required to follow the law as stated by the Seventh Circuit Court of Appeals; (2) the court must predict what the Illinois Supreme Court would hold; and (3) the court must apply state law as interpreted by the Illinois Appellate Court which has jurisdiction over the county in which this case would have been brought had it been filed in state court (here, the Second District).

With respect to the first option, the Seventh Circuit has stated:

> Ordinarily a lower court has no authority to reject a doctrine developed by a higher one. If, however, events subsequent to the last decision by the higher court approving the doctrine—especially later decisions by that court, or statutory changes—make it almost certain that the higher court would repudiate the doctrine if given a chance to do so, the lower court is not required to adhere to the doctrine. But we take seriously Judge Hand's warning against a lower court's "embrac[ing] the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant." *Spector Motor Service, Inc. v. Walsh*, [139 F.2d 809, 823 (2d Cir.) (dissenting opinion), *vacated*, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944)].

*Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731, 734 (7th Cir.1986) (citations omitted).[28]

Where a higher federal court's interpretation of state law is concerned, it has been held that *"stare decisis* requires that a court follow its own, or its Circuit's, earlier

determination as to the law of a state *in the absence of any subsequent change in the state law.* Owens–Illinois, Inc. v. Aetna Casualty and Surety Co.*, 597 F.Supp. 1515, 1520 (D.D.C.1984) (emphasis added), citing *Newell v. Harold Shaffer Leasing Co.*, 489 F.2d 103, 107 (5th Cir.1974), and *Sprinkle v. Farm Bureau Insurance Cos.*, 492 F.2d 469, 471–72 (5th Cir.1974).

Accordingly, this Court is not bound to rigidly follow the Seventh Circuit's result in *Rolling Meadows*, but before it may depart from that precedent it must be convinced that subsequent events would lead the Seventh Circuit to reach a differing result today. Assuming for a moment that this Court is free to look beyond the *Rolling Meadows* in its determination of state law, the question becomes whether option (2) or option (3) above represents the appropriate method in the absence of authority from the Seventh Circuit or the Illinois Supreme Court. The answer to this question is unclear, because there is a split among the judges in this district. Judge Marshall has concluded that the court must predict how the Illinois Supreme Court would resolve the issue. *See Roberts v. Western–Southern Life Insurance Co.*, 568 F.Supp. 536, 539–43 (N.D.Ill.1983) (Marshall, J.). Several other judges have expressed agreement with this approach. *See American Dental Ass'n v. Hartford Steam Boiler Inspection and Insurance Co.*, 625 F.Supp. 364, 366–67 (N.D.Ill.1985) (Plunkett, J.); *UNR Industries, Inc. v. Continental Insurance Co.*, 607 F.Supp. 855, 863 (N.D.Ill.1984) (Hart, J.); *Barr Co. v. Safeco Ins. Co.*, 583 F.Supp. 248, 252–55 (N.D.Ill.1984) (Moran, J.). Judge Shadur, on the other hand, has concluded that the court is bound by decisions of the Illinois Appellate Court for the district in which

---

**28.** *See also Levine v. Heffernan*, 864 F.2d 457, 461 (7th Cir.1988), *cert. denied,* —— U.S. ——, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989). Similarly:

> Inferior federal courts, in order to provide equal justice under the law, must apply the holdings of cases still on the books. Sometimes the imminent demise of a precedent may be plain, as when it rests wholly on an opinion since overruled, and in such cases an

inferior court may apply today's law sure that the empty shell will break under the slightest pressure. When the case stands unquestioned, however, a belief that the Court would not reach the same decision today if the question were open anew is not a basis for disregarding the law on the books.

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1405 (7th Cir.1989).

the case would have been brought had it been brought in state court. *See Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1131–33 (N.D.Ill.1986) (Shadur, J.); *Commercial Discount Corp. v. King*, 552 F.Supp. 841, 847–52 (N.D.Ill.1982) (Shadur, J.).

If this Court were to follow the Seventh Circuit's opinion in *Rolling Meadows*, it would be compelled to rule that the City's sign ordinance is preempted. If it were to decide that *Rolling Meadows* was no longer authoritative in light of the subsequent decisions in *Dingeman* and *Downers Grove*, and if it were to adopt Judge Shadur's approach, it would be compelled to rule that the ordinance is not preempted, following the *Downers Grove* opinion by the Illinois Appellate Court for the Second District. Finally, if the Court were to decide that *Rolling Meadows* is no longer authoritative and that Judge Marshall's approach is proper, it would need to analyze the reasoning expressed in the various cases and predict which reasoning would be adopted by the Illinois Supreme Court.

The *Dingeman* and *Downers Grove* cases, while not consistent with *Ridge* and *Rolling Meadows*, can be read as not contradicting *Dolson*. *Dingeman* and *Downers Grove* upheld restrictions on the size of sign faces of 150 and 200 square feet, respectively, and *Downers Grove* upheld a 20–foot height limit.[29] *Dolson*, on the other hand, invalidated a complete prohibition of off-premises signs. *Dingeman* distinguished *Dolson* on this basis.[30] The most consistent reading of the current status of Illinois law is that municipalities may restrict the size of sign faces to a certain extent, but may not forbid them altogether without running afoul of HACA. Exactly how small the size limits may be is uncertain, but they may be at least as small as 150 square feet in area and 20 feet in height. The City's Sign Code in this case

limits the area of sign faces to 480 square feet and limits the height of signs to 35 feet. It would thus be well within the bounds of the City's powers under state law, in the absence of the *Rolling Meadows* holding that the City may not restrict the size of sign faces beyond the limits provided by HACA.

The Court finds the *Rolling Meadows* opinion is sufficiently undermined by subsequent cases that it can no longer be viewed as controlling, at least with respect to size limits as small as 150 square feet in area and 20 feet in height passed by a home rule municipality. *Dingeman*, *Downers Grove* and *Elk Grove* upheld ordinances passed by home rule municipalities, whereas *Dolson* and *Ridge* concerned non-home rule municipalities. *Dolson* and *Ridge* never examined the possible conflict in HACA's provisions, whereas *Dingeman*, *Downers Grove* and *Elk Grove* recognized and addressed that conflict. *Dingeman*, *Downers Grove* and *Elk Grove* are more recent cases, which were decided with the benefit of the earlier case law and which nonetheless determined that the earlier case law was inapplicable or erroneous. Finally, the Court notes that it has not located any state appellate decision issued since *Rolling Meadows* which has followed *Rolling Meadows* or the earlier state appellate decisions.

This Court's conclusion that *Rolling Meadows* is not controlling is buttressed by its view that the analysis of HACA contained in *Dingeman* is persuasive. Scadron argues that the interpretation of HACA in the earlier cases is superior because it gives effect to all of HACA's provisions and renders the statute internally consistent, whereas the *Dingeman* approach requires judicial elimination of one of HACA's provisions (section 1's statement that regulations more restrictive than those in section 6 are inconsistent with customary use). This Court cannot agree.

---

**29.** The *Downers Grove* court did not specify whether this limit referred to the height of the sign face or the overall height of the sign. In the absence of any indication to the contrary, the Court assumes that the ordinance limits the overall height of the sign. In *Elk Grove*, the court did not state what the provisions of the ordinance were, but they were at least restrictive enough to prohibit a sign 672 square feet in size and 30 feet in height.

**30.** *See supra* at 1450–1451.

Although the earlier cases did not make it explicit, they too found it necessary to ignore certain of HACA's provisions in order to make sense of the statute; they effectively eliminated section 7's statement that when a municipality enacts sign regulations consistent with customary use, section 6 "shall not apply to the erection of signs in such areas." They also effectively eliminated section 7's statement permitting local "regulations with respect to the *size, lighting and spacing* of signs" (emphasis added). It would be meaningless to state that a municipality may regulate, for example, the spacing of signs, but may not require greater spacing than HACA requires. (Of course, it would be equally meaningless to state that municipalities may enact more lenient spacing requirements, for the spacing requirements of HACA would still control.)[31] Thus to hold, as the earlier cases did, that a municipality cannot enact regulations more stringent than those in section 6 is to nullify these provisions in section 7.

A court must adopt that interpretation of a statute "which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that [the legislature] intended." *Comm'r of Internal Revenue v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984). Accordingly,

> [w]here there is want of harmony between the whole act and the language of some particular clause, sentence or

phrase, such inconsistent words may be modified, changed or rejected in order to arrive at a construction conforming to the legislative aim or intent.

*Certain Taxpayers v. Sheahen*, 45 Ill.2d 75, 83, 256 N.E.2d 758, 763 (1970). *See also Paice v. Maryland Racing Comm'n*, 539 F.Supp. 458, 463 (D.Md.1982) (where a statute is inconsistent, the inconsistency must be resolved in light of the statute's purposes). Furthermore, "[t]hough a statute should generally be interpreted to give effect to every provision, a provision resulting from legislative inadvertence or mistake should not be given effect." *United States v. Colon–Ortiz*, 866 F.2d 6, 11 (1st Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989).

The Court agrees with the *Dingeman* court that the inconsistencies within HACA are unavoidable. The Court further agrees that the provision which must give way is the phrase in section 1 that more stringent regulations are inconsistent with customary use. As explained in *Dingeman*, this method of resolving HACA's inconsistencies does the least damage to HACA's purposes and to its overall scheme.[32] Additionally, section 1, as a statement of findings which introduces the remainder of the statute, should be given less weight than the subsequent text of the operative body of the statute. *Elk Grove*, 194 Ill.App.3d 303, 550 N.E.2d 1254, 141 Ill.Dec. 208 (to the extent section 1 conflicts with section 7, it is effectively a preamble). *See also Jurgensen v. Fairfax County*, 745 F.2d 868,

---

**31.** It is possible to hold (as *Rolling Meadows* did) that there are certain aspects of *size* that municipalities may regulate because HACA only regulates the size of the sign face itself and not other aspects of sign sizes. The Court does not see how a similar argument can be made with respect to *spacing*, where there is only one component which may be subject to regulation.

**32.** "The main purpose of [HACA] was to obtain Federal funds and that entailed maximum limitation on advertising signs. The protection for the advertising industry indicated by section 1 was an offshoot of the legislation. Section 7 was a protection for municipalities desiring additional limitations.

"Dingeman agrees that if we adopt its position signs with 1,200 square feet on each side could theoretically be constructed every 100 feet in the commercially zoned area of Mt. Zion that borders State Route 121. We recognize economics and the possible public uproar would provide further protection against such obnoxious construction. However, no municipality traversed by a primary highway could provide advertising regulations consistent with aesthetics planning in commercial or industrial areas bordering the primary State highways....

"Dingeman's position would result in an absurd and unjust result. If signs in municipal areas could only be limited to the maximum limitation of the Act, the purpose of the Act 'to preserve natural beauty and to promote the reasonable, orderly and effective display of such signs, displays and devices' would be frustrated."

*Dingeman*, 157 Ill.App.3d at 464–65, 510 N.E.2d at 541, 109 Ill.Dec. at 673.

885 (4th Cir.1984); *Association of American Railroads v. Costle*, 562 F.2d 1310, 1316 (D.C.Cir.1977). *See also Lodge 1858, American Fed'n of Gov't Employees v. Webb*, 580 F.2d 496, 510 (D.C.Cir.1978) ("[t]he established rule is that if there exists a conflict in the provisions of the same act, the last provision in point of arrangement must control," citing numerous cases), *cert. denied*, 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978).

Because the Court finds *Dingeman's* reasoning to be more complete and persuasive, it believes that the Illinois Supreme Court would also find that sign ordinances such as the one at issue here are not preempted by HACA. It is thus unnecessary, in this case, to resolve the dispute between the approaches of Judge Marshall and Judge Shadur. Under either approach, this Court would uphold the City's Sign Code.[33]

The same cannot necessarily be said with respect to the Zoning Ordinance, which takes the further step of completely prohibiting advertising signs in areas subject to regulation by HACA. The legitimacy of this provision under the decisions in *Dingeman* and *Downers Grove* is unclear. Although *Dingeman* distinguished *Dolson* on the basis that such a prohibition was not in issue in *Dingeman*, the court's reasoning, on its face, would seem to apply to a prohi-

bition as well as to mere size restrictions. In any event, the Court sees no need to reach this issue here. The size restrictions in the Sign Code were sufficient for the City to deny Scadron's permit application; the question of whether or not the Zoning Ordinance is valid thus has no practical effect for Scadron. Furthermore, the issue concerns matters of state law alone. Under all of these circumstances, the Court sees no justification for offering an opinion on this matter.

## VI. DISCRIMINATORY APPLICATION OF ORDINANCES

■ Remaining is Scadron's argument that the City has granted permits to other advertising companies whose billboards are equally, if not more, violative of the zoning and sign ordinances and that this inconsistent treatment of permit applications constitutes a violation of Scadron's constitutional rights under the equal protection clause.[34]

A statute which is valid on its face may violate the equal protection clause if it is applied in a discriminatory manner. *See Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In order to state a claim that a zoning ordinance has been applied in violation of the equal protection clause, Scadron must allege that "the ordinance is applied or enforced with a discriminatory purpose." *Scudder v. Town of Greendale*, 704 F.2d 999, 1002 (7th Cir.

---

**33.** A number of other courts have concluded that state highway advertising control statutes do not preempt more restrictive local ordinances. *See Art Neon Co. v. City and County of Denver*, 488 F.2d 118, 123 (10th Cir.1973), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974); *City of Lake Wales v. Lamar Advertising Association*, 414 So.2d 1030, 1032 (Fla. 1982); *R.O. Givens, Inc. v. Town of Nags Head*, 58 N.C.App. 697, 294 S.E.2d 388, 390 (1982); *City of Doraville v. Turner Communications*, 236 Ga. 385, 223 S.E.2d 798, 801 (1976).

Where preemption has been found, the state statute was much more specific than HACA. Thus, in *Central Advertising Co. v. St. Joseph Township*, 125 Mich.App. 548, 337 N.W.2d 15 (1983), the court was faced with a specific preemption clause in the state statute, which provided: "This act regulates and controls the size, lighting and spacing of signs and sign structures

in adjacent areas and occupies the whole field of that regulation and control except for the following...." The court held that only matters of size, lighting and spacing in adjacent areas were preempted. 337 N.W.2d at 16–17.

**34.** This issue was not argued by either of the parties in the initial briefs, but because it was raised in the complaint, the Court requested and received supplemental briefing on the issue.

Plaintiff also argues that, in addition to violating the equal protection clause by virtue of their discriminatory application, the ordinances violate the equal protection clause on their face. This argument stems from the premise that the ordinances discriminate among types of speech on the basis of the content of the speech. Because the Court has already rejected that premise, *see supra* at Part IV.B.2, the Court finds that the ordinances are not facially invalid under the equal protection clause.

1983).[35] There must be allegations of "unfair and discriminatory conduct purposefully directed toward plaintiffs." *Id.* at 1003, quoting *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir.1980). *See also Orsinger Outdoor Advertising, Inc. v. Dept. of Highways*, 752 P.2d 55, 62 (Colo.1988) (to prove violation of equal protection with respect to discriminatory enforcement of sign ordinance, plaintiff must show "that the enforcement not only proceeded from an unjust and illegal discrimination between persons in similar circumstances but also that the discriminatory enforcement was intentionally or purposefully carried out").[36] "Discriminatory purpose," in this sense, "implies more than intent as volition or intent as awareness of consequences. It implies that the decision-maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir.1982).

In Scadron's complaint, there is no specific allegation of discriminatory purpose. However, Scadron has requested leave, in conjunction with its briefing of the equal protection issue, to amend its complaint to include allegations that the City intentionally discriminates against small sign companies in the enforcement of its ordinances. According to Scadron, the City treats large sign companies more favorably because large companies can afford to put up numerous signs and can thus be dissuaded from litigating by a compromise which allows them to erect some, but not all, of the signs they propose.

The City argues that even with the amendment, Scadron fails to state a claim under the equal protection clause. The City argues that it would not be in its interest to discriminate against small sign companies in the application of its ordinances, and indeed that, if anything, it would be in the City's interest to favor small sign companies rather than large ones. The Court does not find this argument to be helpful. It is relevant only to whether Scadron's allegations are true, and a motion to dismiss is not the appropriate forum to consider whether the alleged discrimination has actually occurred.

The City also argues that there is no case holding that the size of a company is an invidious or irrational classification. The absence of a suspect class does not affect the existence of a cause of action; it merely affects the standard of review. *Stringer v. Rowe*, 616 F.2d 993, 998 (7th Cir.1980), quoting *Durso v. Rowe*, 579 F.2d 1365, 1372 (7th Cir.1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979). With respect to the rationality of the classification, the absence of any prece-

---

**35.** *Scudder* also stated that enforcement of an otherwise valid zoning ordinance may be unconstitutional if "the decision of the particular zoning body is arbitrary." 704 F.2d at 1002, citing *South Gwinett Venture v. Pruitt*, 491 F.2d 5, 7 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974). *South Gwinett* was decided on due process grounds rather than equal protection grounds, and Scadron has not alleged that the manner in which the ordinance has been enforced violates the due process clause. Even if such an allegation were intended, the Court doubts that it would survive. "A particular decision or action is 'arbitrary' if it is reached 'without adequate determining principle or was unreasoned.'" *Scudder*, 704 F.2d at 1002, quoting *United States v. Carmack*, 329 U.S. 230, 243, 67 S.Ct. 252, 258, 91 L.Ed. 209 (1946). In *Scudder*, the Court found that it was not arbitrary to deny a building permit where a valid ordinance prohibited the type of construction which the plaintiff wished to perform. 704 F.2d at 1002. Similarly, because the City's denial of a permit to Scadron represents a straightforward application of a valid ordinance, it is not arbitrary.

**36.** *Orsinger*, a case which neither party cited, is the only case this Court was able to locate addressing a claim that a sign statute was discriminatorily enforced in violation of the equal protection clause. The court found no evidence that the defendant "intentionally or purposefully carried out a program of discriminatory enforcement against [the plaintiff's] signs" and accordingly rejected the equal protection claim. 752 P.2d at 62.

dent is not determinative. Whether the classification is rational or not is not an issue which can be decided on a motion to dismiss.[37] The City cites *Evans v. City of Chicago*, 873 F.2d 1007 (7th Cir.1989), as the closest example it can find of a "small versus large" equal protection claim. In *Evans*, the Court found that the classification at issue did not violate equal protection; however, the Court made this determination after evidence had been received, not on a motion to dismiss.

The Court emphasizes that it expresses no view as to whether Scadron's equal protection claim is likely to succeed. It is true, as the City points out, that unequal treatment in itself does not violate equal protection. However, the complaint as amended alleges more than mere unequal treatment; it alleges that the City has intentionally treated Scadron differently because Scadron is a small sign company which has fewer resources than larger sign companies. The Court cannot conclude that the complaint, in light of the proposed amendment (which the Court will allow), does not state a claim on its face.

## VII. CONCLUSION

The City's motion to dismiss is granted with the exception of Scadron's equal protection claim, which is not dismissed. Scadron's motion for leave to amend its complaint is granted.

---

**37.** In support of its argument to the contrary, the City cites *D'Acquisto v. Washington*, 640 F.Supp. 594 (N.D.Ill.1986), in which the Court dismissed the complaint and stated: "As long as a law or regulation is rationally based, the mere failure of those who administer it to treat all persons who have violated it with complete equality does not of itself infringe the constitutional principle of equal protection. The equal protection clause prohibits selective enforcement which is 'deliberately based upon an unjustifiable standard such as race, religion or other arbitrary classification.'" 640 F.Supp. at 625. *See also Kukla v. Village of Antioch*, 647 F.Supp. 799, 812 (N.D.Ill.1986). In this case, however, such an arbitrary classification is alleged under the proposed amendment to the complaint.